[No. C044284. Third Dist. Jan. 4, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
PEDRO GUIDO, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION[*]]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I through IV and parts VI through VIII of the Discussion.

## Counsel

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Stephen G. Herndon and James Ching, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**HULL, J.**—Defendant Pedro Guido stands convicted by a jury of five counts of aggravated sexual assault of a child by rape (Pen. Code, § 269, subd. (a)(1); all unspecified statutory references are to the Penal Code), one count of aggravated sexual assault of a child by oral copulation (§ 269, subd. (a)(4)), and 10 counts of lewd acts with a child by force (§ 288, subd. (b)(1)). The trial court sentenced him to consecutive terms of 15 years to life for each of the sexual assault convictions and to consecutive terms of six years each for the 10 convictions of lewd acts with a child. His determinate term is thus 60 years and his indeterminate term is 90 years to life. He appeals claiming error in the instructions, cumulative error, and error under *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 413–414, 124 S.Ct. 2531] (*Blakely*).

Noting an error in the abstract, we affirm the judgment.

### Facts

The victim, M., is defendant's niece. At the time of trial in April 2003, M. was 13 years old. Her 14th birthday was in May 2003. At the time of trial defendant was 36 or 37 years old.

When M. was eight, her family, including her mother, her father, her maternal grandmother, her sister, her brother, and defendant, moved to a white house on Franklin Boulevard in Sacramento. During the time they lived in the white house, M. and her female cousin, who is a year younger than M., played "hide and go seek" with defendant. Defendant looked only for M. and tried to "touch" her when he found her. Specifically, when defendant found M. he picked her up from behind and grabbed her breasts outside of her clothing as if he were hugging her.

When M. was "probably like nine" her family moved to a house on Harms Way. M., her parents, her sister, and her brothers lived in the house, as did defendant. Both of M.'s parents worked at the time and defendant took care of M. when her parents were at work.

M. estimated that about three times a week while living on Harms Way, defendant would lie on his back on the couch in the living room with his legs on her lap. Defendant would cover the two of them with a burgundy blanket and take M.'s hand and place it on his penis outside of his clothing. The first time he grabbed her hand, defendant pressed it down and moved it around in his groin area so, she assumed, he could "feel something." On other occasions, defendant held her hand on his crotch and when she closed her hand or tried to pull it away, he placed her hand back where it had been and told her in Spanish to leave her hand where it was. The first time this occurred, M. could feel defendant's penis under his clothing but "it was just soft." In later incidents, "sometimes [defendant's penis] was hard, and sometimes it wasn't." Perhaps once a week defendant placed M.'s hand directly on his penis inside his clothing.

M. did not tell her parents about defendant's actions because, even though she did not like what he did, she did not know it was wrong, and because defendant took the place of her father when her father was not home and she was expected to obey him.

When M. was 11, her family moved to an apartment on East Parkway. While they lived there defendant returned to Mexico. Shortly after M. reached the age of 12 the family moved again, this time to an apartment on Sky Parkway where she lived with her mother, her father, her sister and her two brothers. Defendant returned from Mexico while the family lived on Sky Parkway although he lived with M.'s grandmother upon his return. By this time M., who was 11 or 12, had a boyfriend named Francisco who was, she thought, three years older than M., that is, 14 or 15 at the time they met.

When defendant returned from Mexico, M. was scared of him and she "knew something was going to go wrong" because of his attitude. She complained to her parents that defendant acted as if he owned her and went wherever she went. Despite her complaint, her parents said M. had to listen to defendant because he was her uncle and he would be babysitting with her.

By this time, M.'s mother had spoken to M. about sexual matters and M. knew that certain sexual conduct was wrong.

The family moved to a house on Lang Avenue when M. was 13. She continued to see Francisco and was engaging in sexual relations with him. Although her mother did not know about the intimate nature of M.'s relationship with Francisco, defendant discovered that M. and Francisco were sexually intimate. Defendant became angry. He told M. that if she was "doing it" with Francisco she had to "do it" with defendant too, because "that's what [she] wanted." She did not want to submit to defendant but he threatened to tell her mother that M. and Francisco were engaging in sexual intercourse.

Ultimately, M. had sexual intercourse with defendant on five different occasions either at M.'s house or at her grandmother's house. On three occasions, M. had sexual intercourse with defendant on the couch in M.'s home and twice, at defendant's direction, they had sexual intercourse at defendant's mother's—M.'s grandmother's—house in her grandmother's bed. M. cried and tried to talk defendant out of it each time.

On one occasion, when it appeared to M. defendant had ejaculated, M. got up and put her clothes on and ran out of the house. Defendant later called M. and told her she had to "do it" again because she had not let him finish and that he wanted her to be with him until he was tired or until defendant said it was over.

On another occasion, defendant insisted that M. "put it in [her] mouth." She said she did not want to and that "it" was nasty so defendant put on a condom and put his penis in her mouth. This caused M. to want to vomit and she ran to the bathroom.

M. submitted to defendant's demands because of his continuing threats. Defendant threatened to kill Francisco and throw him in a river, he threatened to kill her family in front of her and then kill her and then himself. M. believed defendant's threats because he was always using drugs and was drunk. Moreover, M. saw defendant with a rifle and a gun and there was always a knife around. He once took a gun out of his pocket and put it on a table and told M. he was going to kill M.'s mom with it. M. was afraid of him but never told her parents because she was afraid "he might kill them or kill me or something."

M. thinks that it was on December 26, 2001, that defendant and her grandmother were at her house and defendant told his mother that M. had been sexually intimate with Francisco and that defendant had also engaged in sexual conduct with M. When confronted by her grandmother, M. admitted having a sexual relationship with Francisco and, when her grandmother asked

her whether or not it was true that M. and defendant had sexual relations, she told her grandmother that it was. Her grandmother began crying and she left M.'s house to return to her own "because we had some problems right after we talked." Her grandmother said that she wanted to keep the matter between defendant, M., and herself and did not want anybody to know. Her grandmother said she did not want to turn defendant into the police and that defendant would never do "that" to her again.

Later that day, either M.'s grandmother or M.'s sister W., called M. and told her to come to her grandmother's house. She did and there was further conversation; W. did not think it was "okay to be quiet" and said she was going to turn defendant in. Other family members began to arrive and then everyone knew what had been occurring.

On the second day of her trial testimony, M. initially stated an inability to recall any of the details of her sexual activity with defendant. When pressed, she explained that after she testified on the first day, M. had to take her SAT-9 test at a testing center after which her grandmother gave her a ride home. They spoke about the trial and M.'s testimony and her grandmother told her she should "take some charges off" because "they were going to give [defendant] a lot of years." M. told her grandmother that she did not know what she was going to do until she returned to court but that she would not change what she had already said. M. explained that, if she changed her testimony, it would appear that she had been lying about the entire matter and she had not. Her grandmother talked to M. about her testimony "probably" once a month from February 2003 to the time of trial in April. The first time M.'s grandmother asked her to "take some of the charges off" her grandmother said she was planning on killing herself.

G. is M.'s father and defendant's brother-in-law. Defendant lived with G. and his family, including M., for three years at their residence on Harms Way. When G. and his wife both worked, they would sometimes leave M. with defendant. The family then moved to Lang Avenue and defendant would sometimes stay with them at that residence also.

On Christmas Day 2001, G.'s daughter W. returned to G.'s house crying after having been at her grandmother's house. W. would not tell G. what had upset her, so he went to M.'s grandmother's house where he found M.'s grandmother, the grandmother's brother, and defendant. They would not tell G. what was happening but did say that M. was in the bathroom. G. found her there, scared, trembling, and crying, but she would not tell him what had

occurred. M. finally said that she had engaged in sexual relations with defendant. G. confronted defendant about what M. had said and "he answered me yes, they had," but said it took place on only one occasion. Defendant's mother (M.'s grandmother) confirmed what defendant said. When M.'s mother arrived, G. told her what had occurred and she became hysterical. They called 911 and gave the information to the police when the police arrived.

G. said that he and his wife trusted defendant because he was his wife's favorite brother.

Defendant testified and admitted to three instances of sexual misconduct with M. After he discovered that M. was sexually intimate with Francisco, defendant threatened "to tell on them." Soon thereafter, M. came to him and offered to have sexual intercourse with defendant if he would not tell her mother about M.'s relationship with Francisco. Defendant could not get an erection on this occasion because he was using drugs "but she [touched] my penis."

On a second occasion a month later, M. was watching television while sitting on a bed. Defendant got onto the bed next to her and M. complained that her hand hurt and asked him to massage it. He placed her hand on his erect penis which was outside his pants and she rubbed it until he ejaculated.

On a third occasion in November 2001, M. called defendant to her home and asked him to bring her tacos. When he got there she was sitting in a chair and he leaned over her and "started grabbing her breasts." M. said that he should close the door. He did, but forgot to lock it and W. walked in and "saw me bending over M.'s [bare] chest."

Defendant denied M.'s other allegations and said he did the things he admitted to at trial because, at the time of the encounters, he was under the influence of methamphetamine and alcohol.

On Christmas Day, defendant confessed these matters to his mother because "[he] wasn't happy with what had happened" and "[he] wanted all of that to end." Defendant was drunk and once M. started yelling that he had raped her after M.'s mother arrived at the house, he went outside and did not say anything further.

DISCUSSION

I–IV*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

V

*The Trial Court's Sua Sponte Duty to Define "Force"*

As noted earlier, defendant stands convicted of five counts of aggravated sexual assault of a child by rape and one count of aggravated sexual assault of a child by forcible oral copulation. Defendant argues that the court erred in failing to define, on it own motion, the word "force" as that concept applies to the counts that alleged forcible rape and the additional count that alleged forcible oral copulation.

Regarding the five counts alleging aggravated sexual assault of a child in violation of section 269, subdivision (a)(1) by forcible rape within the meaning of section 261, subdivision (a)(2), the essence of the crime is forcible rape.

■ After briefing was completed in this matter, the California Supreme Court held in *People v. Griffin* (2004) 33 Cal.4th 1015 [16 Cal.Rptr.3d 891, 94 P.3d 1089] (*Griffin*) that the Legislature did not intend the word "force," as that term is used in section 261, subdivision (a)(2) to have a specialized legal definition. The court observed that "it has long been recognized that 'in order to establish force within the meaning of section 261, [former] subdivision (2), the prosecution need only show the defendant used physical force of a degree sufficient to support a finding that the act of sexual intercourse was against the will of the [victim].' [Citation.]" (33 Cal.4th at pp. 1023–1024.) The court held the Legislature intended the term "force" to have a common usage meaning and there is no sua sponte duty on the part of the trial judge to define the term for the jury. (*Id.* at p. 1024.) In light of *Griffin*, as to the five counts that rested on a conviction of forcible rape, there was no error.

We turn then to the count that alleged aggravated sexual assault of a child by forcible oral copulation.

■ In *People v. Cicero* (1984) 157 Cal.App.3d 465 [204 Cal.Rptr. 582], this court considered the meaning of the term "force" as it appears in section

---

*See footnote, *ante*, page 566.

288, former subdivision (b) (now subdivision (b)(1)) relating to sexual abuse of a child by force. The court held, where there has been no physical harm to the child, the word "force" as used in section 288, former subdivision (b) requires proof that a defendant used physical force "substantially different from or substantially greater than that necessary to accomplish the lewd act itself." (*Cicero, supra,* at p. 474.)

After the court's decision in *Cicero,* a number of California cases held, or suggested, that the term "force" as it is used in statutes defining sexual offenses other than violations of section 288, subdivision (b)(1) requires proof that the defendant used physical force substantially different from or substantially greater than the force inherent in the sexual act itself. (See, e.g., *People v. Elam* (2001) 91 Cal.App.4th 298, 306 [110 Cal.Rptr.2d 185] [assault with intent to commit forcible oral copulation]; *People v. Mom* (2000) 80 Cal.App.4th 1217, 1224 [96 Cal.Rptr.2d 172] [rape in concert]; *People v. Senior* (1992) 3 Cal.App.4th 765, 774 [5 Cal.Rptr.2d 14] [forcible oral copulation]; *People v. Bergschneider* (1989) 211 Cal.App.3d 144, 153 [259 Cal.Rptr. 219] [forcible rape].) Such decisions need to be reassessed in light of *Griffin.*

Restricting our discussion to the crime we consider here, forcible oral copulation, we must decide whether oral copulation committed by force in violation of section 288a, subdivision (c)(2) requires physical force substantially different from or substantially greater than that amount of force inherent in the act of oral copulation. If it does, the term "force" carries a specialized legal meaning and the court erred when it failed to instruct the jury, sua sponte, of that meaning. (*People v. Pitmon* (1985) 170 Cal.App.3d 38, 52 [216 Cal.Rptr. 221].)

As *Griffin* recognized, the term "force" as used by the Legislature in sexual offense statutes does not have a constant meaning; the meaning changes depending on the crime to which the term is applied.

As *Griffin* found, unlike the crime of lewd and lascivious acts with a child accomplished by force, "[t]he element of force in forcible rape does not serve to differentiate between two forms of unlawful sexual contact . . . ." (*Griffin, supra,* 33 Cal.4th at p. 1027.) Rather, "[w]hen two adults engage in *consensual* sexual intercourse, with or without physical force greater than that normally required to accomplish an act of sexual intercourse, the forcible rape statute is not implicated. The gravamen of the crime of forcible rape is a sexual penetration *accomplished against the victim's will* by means of force,

violence, duress, menace, or fear of immediate and unlawful bodily injury. . . . [I]n a forcible rape prosecution the jury determines whether the use of force served to overcome the will of the victim to thwart or resist the attack, *not* whether the use of such force physically facilitated sexual penetration or prevented the victim from physically resisting her attacker." (*Ibid.*)

■ These concepts apply equally to the crime of forcible oral copulation. Consensual oral copulation, with or without physical force greater than that normally required to accomplish the act, is not unlawful except when accomplished under circumstances violative of section 288a. As with forcible rape, the gravamen of the crime of forcible oral copulation is a sexual act accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury. As with forcible rape, it is only when one participant in the act uses force to commit the act against the other person's will that an otherwise lawful act becomes unlawful.

■ Unlike sexual abuse of a child by use of force, a specialized definition of force is not necessary to the crime of forcible oral copulation because a different concept of force is not needed to distinguish between two crimes or to give substance to the Legislature's use of the term "force," such as it is in section 288, subdivision (b)(1).

■ We note, too, the statutory language, "accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury," (§ 286, subd. (c)(2)) is the same language that makes two otherwise lawful acts criminal.

■ In all, there is no reasoned basis to apply a different concept of the term "force" to forcible rape and forcible oral copulation and we hold oral copulation by force within the meaning of section 288a, subdivision (c)(2) is proven when a jury finds beyond a reasonable doubt that defendant accomplished an act of oral copulation by the use of force sufficient to overcome the victim's will. The term does not carry a specialized legal definition and the trial court was not required to give the jury a definition of the word "force." Thus, there was no error.

VI–VIII*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 566.

### DISPOSITION

The judgment is affirmed. The abstract of judgment shall be amended to reflect that count six was a violation of section 269, subdivision (a)(4). The trial court is directed to prepare an amended abstract of judgment and to forward a certified copy to the Department of Corrections.

Morrison, Acting P. J., and Butz, J., concurred.

A petition for a rehearing was denied January 18, 2005, and appellant's petition for review by the Supreme Court was denied March 30, 2005.