[No. A127337. First Dist., Div. Three. Mar. 28, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
DEAN WILLIAM HALE, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III. and IV. of the Discussion.

## COUNSEL

Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Seth K. Schalit and Bridget Billeter, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

McGUINESS, P. J.—A jury found appellant Dean William Hale guilty of numerous sexual offenses involving three young female victims. Appellant raises a number of related claims on appeal based upon his contention that a 10-year statute of limitations applies to a violation of Penal Code[1] section 269 for aggravated sexual assault upon a child. He also contends that the evidence was insufficient to support a conviction of forcible sodomy (§ 286, subd. (c)(2)), that evidence of a prosecution witness's prior theft conviction was improperly excluded, and that the prosecutor committed misconduct by making improper arguments, denigrating defense counsel, vouching for a prosecution witness, and mischaracterizing the evidence. We find no merit in appellant's contentions and shall affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

#### Procedural History

In a 58-count second amended information filed October 19, 2009, the Contra Costa County District Attorney charged appellant with 42 counts of lewd acts on a child under age 14 (§ 288, subd. (a)), one count of sexual penetration of a child under age 14 (§ 289, subd. (j)), two counts of forcible sodomy (§ 286, subd. (c)(2)), six counts of aggravated sexual assault of a

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

child (§ 269, subd. (a)(1) & (3)), four counts of sexual acts with a child 10 years old or younger (§ 288.7), and three counts of forcible lewd acts on a child under age 14 (§ 288, subd. (b)(1)). Jane Doe No. 1 was the alleged victim in counts 1 through 30, Jane Doe No. 2 was the alleged victim in counts 31 through 34, and Jane Doe No. 3 was the alleged victim in counts 35 through 58. The district attorney further alleged in the information that appellant committed the offenses against more than one victim (§ 667.61, subd. (c)) and that the prosecution of sex crimes allegedly committed against Jane Doe No. 2 and Jane Doe No. 3 had commenced within the applicable statute of limitations pursuant to sections 801.1 and 803, subdivision (f).

By agreement of the parties, the court granted a defense motion to dismiss two charged counts of lewd acts on a child under age 14 (§ 288, subd. (a)) allegedly committed against Jane Doe No. 2. A jury found appellant guilty of the remaining counts. The jury also found the multiple victim enhancement to be true.

The court sentenced appellant to an indeterminate prison term of 325 years to life. The court also imposed a consecutive determinate term of eight years, comprising the upper term for the conviction of sexual penetration of a child under 14 (§ 289, subd. (j)). Appellant filed a timely notice of appeal.

### *General Background*

Lisa V. is the mother of Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3. Jane Doe No. 2 and Jane Doe No. 3 have the same father. Appellant is the father of Jane Doe No. 1.

Appellant met Lisa and her two oldest daughters, Jane Doe No. 2 and Jane Doe No. 3, on Mother's Day in 1995 or 1996. At the time, Jane Doe No. 3 was 10 years old and Jane Doe No. 2 was eight years old. Lisa and appellant became friends and, according to Lisa, had sex on one occasion, resulting in her becoming pregnant. After Lisa became pregnant, she and appellant moved into a house together on C Street in Antioch. Lisa worked the graveyard shift while appellant, who was a truckdriver, stayed home with her daughters.

Jane Doe No. 1 was born on March 26, 1997. When Jane Doe No. 1 was around eight months old, Lisa and her daughters moved out of the C Street house after the relationship between Lisa and appellant deteriorated. Lisa and her daughters moved into unit 10 of the apartment complex in which they had previously resided. Around that time period, Jane Doe No. 2 and Jane Doe No. 3 continued to visit with appellant on weekends.

Following her split from appellant, Lisa started dating a man named Calvin. She became pregnant with his child and gave birth to Calvin, Jr.,

approximately two and a half years after Jane Doe No. 1 was born. Around the same time, Jane Doe No. 3, who was 14 years old, stopped visiting appellant. When Jane Doe No. 2 was around 13 years old, during the time the family lived in unit 10, she complained of stomach aches and eventually ran away from home. Jane Doe No. 2 was not in contact with her mother for about a year and a half. She started visiting her mother periodically after that but never returned to live permanently with Lisa.

In 2002, Lisa moved to unit 155 in an apartment complex across the street from the unit 10 apartment along with Calvin, Calvin, Jr., and Jane Doe No. 1. By that time, Jane Doe No. 2 had run away and was living on the streets. About a year and a half after moving into unit 155, Calvin moved out after he and Lisa broke up. Lisa's mother and Jane Doe No. 3 moved into unit 155 after Calvin left.

While the family was living in unit 155, Jane Doe No. 1 visited regularly with appellant unless he was out of town on a long-haul trucking job. Appellant moved into unit 155 for a few months after his mother died.

At some point in 2006, the family moved to a house on Buck Mountain Court in Antioch. Jane Doe No. 1 continued to visit regularly with appellant while the family resided at the house on Buck Mountain Court. In late 2007, appellant stayed at the Buck Mountain Court house for approximately six months because he was suffering from a medical problem.

At the end of 2007 and the beginning of 2008, Jane Doe No. 2 was staying with Lisa at the house on Buck Mountain Court. Lisa overheard several arguments between Jane Doe No. 2 and appellant during which Jane Doe No. 2 would say things such as, "At least I don't touch my daughter." Lisa asked Jane Doe No. 2 what she meant, but Jane Doe No. 2 would not say.

Around the same time, appellant began custody proceedings against Lisa in an attempt to gain custody of his daughter, Jane Doe No. 1. On February 10, 2008, Jane Doe No. 2 finally told her mother that appellant had been molesting her and her sisters. Lisa called the police on February 11, 2008. Appellant was ultimately arrested on April 14, 2008.

### *Jane Doe No. 3 (Counts 35 through 58)*

The first time appellant acted inappropriately towards Jane Doe No. 3 occurred when she was 11 years old. At the time, appellant was living with Lisa and her daughters in the house on C Street. Appellant was taking a bath and called Jane Doe No. 3 and Jane Doe No. 2 into the bathroom. Appellant

opened the shower curtain and asked, "[Do] you want to look at it?" Jane Doe No. 3 ran out of the bathroom after appellant showed them his penis.

About a week later, appellant began rubbing Jane Doe No. 3's back and then "slowly [went] to the front" and rubbed her breasts while she was in bed. On other occasions, appellant got on top of Jane Doe No. 3, held her down on the bed, and fondled her breasts and vagina over her clothes.

Appellant moved back to his old house after he broke up with Lisa. Following the breakup, Jane Doe No. 3 visited appellant five or six times a month for about a year. It was during this time that appellant began fondling Jane Doe No. 3 both over and under her clothes. She tried to push his hands away but he persisted. During this time period, he touched her breasts under her clothes between 25 and 30 times, and he touched her vagina under her clothes between 15 and 20 times.

When Jane Doe No. 3 was 12 or 13 years old, appellant moved into an apartment in the same apartment complex in which she was living. She was visiting appellant once or twice a week at the time. It was around this time that appellant starting having sexual intercourse with Jane Doe No. 3. On the first occasion, appellant called her into his bedroom, told her they would watch TV, made her lie down on the bed, started touching her, got on top of her, and took her clothes off. Appellant put his penis in her vagina. Afterward, appellant said if she told anyone that he would take her away and hurt her mother and family. Appellant had sexual intercourse with Jane Doe No. 3 approximately 15 to 20 times, up until she was 14 years old and stopped visiting him. Jane Doe No. 3 physically resisted appellant on four or five occasions but otherwise "just let him do it and get it over with." On one occasion, appellant pushed her down, took her pants off, and sodomized her.

### Jane Doe No. 2 (Counts 31 through 34)

Jane Doe No. 2 recalled an incident in which appellant called her and Jane Doe No. 3 into the bathroom at the C Street house. He was taking a bath and asked the girls if they wanted to touch his penis. They both touched it, according to Jane Doe No. 2.

After Lisa and her daughters moved into an apartment, Jane Doe No. 2 and Jane Doe No. 3 continued visiting appellant at his house. When Jane Doe No. 2 was nine, appellant asked if he could put his penis inside of her. After putting Vaseline on his penis and her vagina, he started to put his penis in her vagina. Jane Doe No. 2 told him it hurt, but appellant said it would hurt for just a minute and then it would not hurt anymore. Appellant stopped after

Jane Doe No. 2 jerked away. Appellant told her not to tell anyone or she would not see her family again.

During subsequent visits, appellant asked Jane Doe No. 2 to touch or suck his penis. She refused. On one occasion when Jane Doe No. 2 was nine, she got out of the shower and entered the bedroom. She saw appellant and Jane Doe No. 3 in bed together with a blanket covering them. Appellant was on top of Jane Doe No. 3. It appeared to Jane Doe No. 2 that they were having sex. Appellant told her to go back to the shower and that he would let her know when to come out.

On one occasion when Jane Doe No. 2 was 19 years old, she visited her mother. She and Jane Doe No. 3 were sleeping in the living room. At around midnight, she heard noises from her mother's bedroom. She woke up Jane Doe No. 3, and they went to investigate the noises coming from the bedroom. Upon opening the door, they saw appellant in bed on top of Jane Doe No. 1.[2] Jane Doe No. 3 took Jane Doe No. 1 to the front room. Jane Doe No. 2 told appellant she was going to call the police. Appellant tried to grab the phone and told them he was sorry, that he needed help, and that he would not do it again. Appellant also told Jane Doe No. 2 that if she called the police, he would make sure they never saw their mother again. Jane Doe No. 2 did not call the police.

When she was around 20 years old, Jane Doe No. 2 was staying with her mother at the house on Buck Mountain Court. On February 10, 2008, she was talking with her mother about the custody case appellant had initiated. Her boyfriend, whom she referred to as the father of her children, was also present. The boyfriend encouraged her to tell her mother what appellant had done to her and her sisters. He said he would tell if she refused. Jane Doe No. 2 then told her mother about the molestation.

### Jane Doe No. 1 (Counts 1 through 30)

Jane Doe No. 1 visited appellant at his house when she was six or seven years old. He asked her to touch his penis. She complied. Subsequently, at appellant's request, Jane Doe No. 1 masturbated him until he ejaculated. He had her touch his penis more than 20 times during the year she visited him at his house. He also fondled her vagina more than 20 times during that period.

When appellant was living with Lisa's family at the unit 155 apartment, he had sexual intercourse with Jane Doe No. 1 more than 25 times. He also had her masturbate him 20 to 25 times during that time period. According to Jane

---

[2] According to Jane Doe No. 3, Jane Doe No. 1 was on top of appellant.

Doe No. 1, when she was seven years old appellant was engaged in sexual intercourse with her when Jane Doe No. 2 and Jane Doe No. 3 entered the room and pulled her away from appellant.

The family moved into the house on Buck Mountain Court when Jane Doe No. 1 was around eight or nine years old. During the period that appellant lived with the family in that house, he had sexual intercourse "maybe a little more than 25 times" with Jane Doe No. 1, fondled her 20 times, and had her masturbate him about 20 times. On one occasion, he sodomized her at the Buck Mountain Court house.

Appellant moved out of the Buck Mountain Court house when Jane Doe No. 1 was nine or 10 years old. Jane Doe No. 1 continued to visit appellant after he moved out. During these visits, appellant had sexual intercourse with Jane Doe No. 1 a total of "a little more than 25 times." On about 10 occasions, appellant parked his truck by the waterfront and had sexual intercourse with Jane Doe No. 1 in the truck's sleeper cab.

When she was seven or eight years old, Jane Doe No. 1 started telling her family that she did not want to visit with appellant. According to her mother, Jane Doe No. 1 often complained of stomach aches when the family lived in the unit 155 apartment. Jane Doe No. 1 never told anyone about the molestation because appellant told her not to tell or else he would get in trouble.

Jane Doe No. 1 was first interviewed by the police on February 11, 2008, after her mother called the police about the molestation. Jane Doe No. 1 had been visiting with appellant when the police came to interview her. Appellant told her not to tell the police anything or he would go to jail. Jane Doe No. 1, who was scared and confused, told the officer that appellant had not touched her. A few weeks later, when she was interviewed at the children's interview center, she told the truth because she knew it was the "right thing" to do.

On March 3, 2008, a doctor examined Jane Doe No. 1. She told the doctor her father had first started touching her inappropriately beginning when she was five or six and that it had last happened in February 2008. The doctor reported that Jane Doe No. 1 had a white area of probable scar tissue between her vagina and anus. The doctor was able to see one and a half inches into her vagina, as compared to at most a half-inch in a typical girl her age. The doctor concluded the exam results offered definitive evidence of prior vaginal penetration consistent with the history given by Jane Doe No. 1. The doctor explained that physical evidence is found in only 10 percent of alleged sexual assault cases and that Jane Doe No. 1's results fell into the fewer than 2 percent of all cases in which there are definitive findings of prior penetration.

### Appellant's Statements to Police

A police officer conducted a videotaped interview of appellant on April 14, 2008. Appellant waived his *Miranda* rights at the outset of the interview. (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].) The videotape was played for the jury. Initially, appellant denied the victims' allegations. He claimed they were fabricating the allegations in response to his attempt to get custody of Jane Doe No. 1 and because he had caught Lisa and her older daughters stealing some of his belongings. He also claimed family members were pushing Jane Doe No. 1 into making accusations against him.

During the course of the interview, appellant eventually admitted that the allegations against him were true. He stated he never touched his nieces and that the only children he had touched inappropriately were Lisa's daughters. He admitted that he had once asked Jane Doe No. 1 to touch him "down there," and "that's where it started." He stated that the first inappropriate conduct with Jane Doe No. 2 and Jane Doe No. 3 was on an occasion when he was in the bathtub and they came into the room to talk to him. According to appellant, they were curious about his penis so he let them look at it.

Appellant admitted he told Jane Doe No. 1 that he would go to prison if she told her mother or anyone else. He also stated he only had sex with Jane Doe No. 2 on one occasion, claiming it "was never [Jane Doe No. 2] hardly. It was just [Jane Doe No. 3]."

### Defense Case

Timothy Bedgood was an Antioch police officer as of February 2008. He testified at trial regarding his response to Lisa's initial report of molestation. Although he did not have any independent recollection of the case, his report indicated he interviewed the victims on February 11, 2008. The defense played his audiotaped interviews with the victims. In the audiotaped interviews played for the jury, Jane Doe No. 1 denied any inappropriate touching by her father and Jane Doe No. 3 denied having anal or oral sex with him. Bedgood admitted that after taking the initial report from Lisa, he called appellant, who was with Jane Doe No. 1, and asked them to meet him at Jane Doe No. 3's workplace. Jane Doe No. 3 had already returned to Lisa's home, so Bedgood placed Jane Doe No. 1 in his patrol car and asked appellant to follow him to Lisa's home. Bedgood admitted that appellant was present outside Lisa's home during the initial interview with the victims.

A number of people who were either related to appellant, had rented a room to him, or had lived with him testified that they had not seen appellant

acting inappropriately toward Jane Doe No. 1, Jane Doe No. 2, or Jane Doe No. 3. According to some of the defense witnesses, Jane Doe No. 1 never acted nervous or fearful around appellant and, in fact, was sad and upset when it was time to return to her mother's home.

### DISCUSSION

I. *The Convictions for Aggravated Sexual Assault of a Child Are Not Barred by the Statute of Limitations.*

The jury found appellant guilty in counts 32, 37, 57, and 58 of aggravated sexual assault of a child under the age of 14 and more than 10 years younger than appellant. (§ 269, subd. (a)(1) & (3).) In the information, the district attorney alleged that the conduct giving rise to counts 32, 37, 57, and 58 occurred between the following dates: April 1996 to April 1998 (count 32), August 1997 to August 1999 (count 37), August 1997 to August 1998 (count 57), and August 1998 to August 1999 (count 58).

Appellant contends that a 10-year statute of limitations applies to a violation of section 269 for aggravated sexual assault upon a child. Based on his contention that the applicable limitations period is 10 years, appellant makes three related arguments. First, he contends counts 32 and 57 are subject to dismissal as a matter of law because the conduct giving rise to those charges occurred more than 10 years before the district attorney commenced the prosecution. Second, he argues the court erred in failing to instruct the jury on the statute of limitations applicable to the charged counts of aggravated sexual assault upon a child. Third, he claims his trial counsel's failure to request adequate jury instructions on the applicable statute of limitations constituted ineffective assistance of counsel.

As we explain, a prosecution for a violation of section 269 may be commenced at any time. Because the predicate for appellant's statute of limitations arguments is incorrect, his claims of error necessarily fail.

The scheme governing criminal statutes of limitations is found in sections 799 through 805. The Legislature overhauled the entire scheme in 1984 with the intent of establishing a more cohesive and consistent approach that bases the length of the limitations statute on the seriousness of the crime. (*People v. Turner* (2005) 134 Cal.App.4th 1591, 1594 [36 Cal.Rptr.3d 888].)

As specified in section 799, certain crimes may be prosecuted at any time, including offenses "punishable by death or *by imprisonment in the state prison for life* or for life without the possibility of parole, or for the embezzlement of public money . . . ." (Italics added.) For purposes of

determining the applicable limitations period for a particular crime, "[a]n offense is deemed punishable by the maximum punishment prescribed by statute for the offense, regardless of the punishment actually sought or imposed." (§ 805, subd. (a).)

■ A violation of section 269 is punishable by a state prison term of 15 years to life. (§ 269, subd. (b).) Therefore, a straightforward application of section 799 leads to the conclusion that a violation of section 269 may be prosecuted at any time.

Appellant relies on section 801.1 to support his claim that a 10-year statute of limitations applies to a violation of section 269. Subdivision (b) of section 801.1 provides in relevant part that "prosecution for a felony offense described in subdivision (c) of Section 290 shall be commenced within 10 years after commission of the offense." Section 290, subdivision (c) lists the crimes for which sex offender registration is required. According to appellant, because section 269 is one of the offenses listed in section 290, subdivision (c), a 10-year statute of limitations applies.

■ Appellant's argument ignores section 803.6, subdivision (a), which provides: "If more than one time period described in this chapter applies, the time for commencing an action shall be governed by that period that expires the latest in time." Sections 799 and 801.1, subdivision (b), when read in isolation, both apply to a violation of section 269. However, when the rule contained in section 803.6, subdivision (b) is applied, section 799 supersedes the 10-year limitation in section 801.1 because it provides for commencement of a prosecution at any time.

■ Appellant claims section 799 is inapplicable because the 15-year-to-life sentence imposed for a violation of section 269 does not qualify as imprisonment in the state prison for life. We disagree. Appellant's argument appears to be that the term "life sentence" is a term of art, citing section 3046 for the proposition that a prisoner who receives a life sentence may be paroled and therefore does not necessarily serve his entire life in prison. However, section 799 by its plain terms applies to crimes punishable by life sentences *with* the possibility of parole as well as to those punishable by life sentences *without* the possibility of parole. (See § 799 [applies to "imprisonment in the state prison for life or for life without the possibility of parole"]; see also Cal. Law Revision Com. com., 50 pt. 1 West's Ann. Pen. Code (2008 ed.) foll. § 799, p. 247 ["no limitation period for . . . crimes punishable by life imprisonment (with or without the possibility of parole)"].) Thus, a 15-year-to-life sentence qualifies as life imprisonment within the meaning of section 799, even though a person who receives such a sentence may eventually qualify for parole if found suitable.

■ Appellant also argues that section 799 applies only to the crimes of murder, aggravated kidnapping, and embezzlement of public money. As support for this argument, appellant cites to Law Revision Commission comments relating to the 1984 revision of section 799. Appellant's interpretation of section 799 is incorrect. First, by its plain terms, section 799 applies to all crimes punishable by death or by imprisonment in state prison for life, with or without the possibility of parole. It is unnecessary to resort to legislative history to aid in the interpretation of section 799 because the statutory language is clear. (See *Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 [21 Cal.Rptr.3d 676, 101 P.3d 563].) In any event, the Law Revision Commission comments cited by appellant do not support his position. The cited comment merely indicates that the revised statute preserves former law as to murder, kidnapping for ransom, and embezzlement of public money, but does not indicate that the statute is limited in application to those three crimes.[3] Further, elsewhere in the commentary the Law Revision Commission states that the revised version of section 799 applies to various crimes punishable by death or life imprisonment other than the three offenses cited by appellant. (Cal. Law Revision Com. com., 50 pt. 1 West's Ann. Pen. Code, *supra*, foll. § 799, p. 247 [§ 799 applies to treason, train wrecking, and procuring execution by perjury, among others].)

■ In his reply brief, appellant urges that we apply the rule of lenity to give him the benefit of a 10-year statute of limitations as to the charged violations of section 269. That rule is inapplicable here. In general, the rule of lenity gives a criminal defendant the benefit of the doubt as to a statute's application only if there are two equally reasonable interpretations of the same provision; the ambiguity must be egregious and incapable of practical resolution by resort to standard principles of statutory interpretation. (See *People v. Bamberg* (2009) 175 Cal.App.4th 618, 629 [96 Cal.Rptr.3d 139].) Here, the language of the relevant statutes is unambiguous. To the extent there is any question as to whether a 10-year statute of limitations applies (§ 801.1, subd. (b)) or whether an action may be commenced at any time (§ 799), the answer is provided by section 803.6, subdivision (a), which clearly establishes that the longer period applies.[4] ■ In effect, the rule

---

[3] Appellant cites the following passage from the Law Revision Commission comments: "Section 799 replaces former Section 799 with the rule that there is no limitation period for capital crimes or crimes punishable by life imprisonment (with or without the possibility of parole), or for embezzlement of public money. This rule preserves former law as to murder (Section 187), kidnapping for ransom (Section 209), and embezzlement of public money (Section 424)." (Cal. Law Revision Com. com., 50 pt. 1 West's Ann. Pen. Code, *supra*, foll. § 799, p. 248.)

[4] We observe that subdivision (b) of section 801.1 provides that a 10-year statute of limitations applies to sex offenses for which registration is required under section 290, subdivision (c), except for specific sex offenses identified in subdivision (a) of section 801.1,

contained in section 803.6, subdivision (a) constitutes a legislative declaration that the rule of lenity is inapplicable when two or more limitations periods technically apply to a particular crime.

Furthermore, appellant's proposed interpretation of the statutory scheme would yield absurd results. If, as appellant suggests, section 801.1, subdivision (b) mandates application of a 10-year statute of limitations to all crimes listed in section 290, subdivision (c) that require registration as a sex offender, the list would include murder (§ 187) when committed during the perpetration of certain sex crimes. In addition, a 10-year statute of limitations would apply to kidnapping with intent to commit various sex offenses (§ 209), a crime that is punishable in some instances by life imprisonment without the possibility of parole. (See § 209, subd. (a).) However, a simple application of section 799 dictates that these crimes may be prosecuted at any time. It makes no sense to apply a 10-year limitations period for such crimes simply because a person convicted of one of these crimes must register as a sex offender. Further, it would be nonsensical to allow prosecution of a murder at any time *except* when it is committed during the perpetration of certain sex crimes. By relying on the principle that the longest potentially applicable limitations period governs when a prosecution may be brought (§ 803.6, subd. (a)), one avoids the absurd result that appellant's interpretation would otherwise produce.

■ Because we conclude that a prosecution for a violation of section 269 may be commenced at any time, the convictions in counts 32 and 57 are not subject to dismissal on statute of limitations grounds. Further, there was no instructional error in connection with the purported failure to instruct the jury on the statute of limitations applicable to section 269. In addition, appellant necessarily did not receive ineffective assistance of counsel as a result of his attorney's failure to request jury instructions on the statute of limitations applicable to section 269. Consequently, we reject appellant's challenges to his convictions for aggravated sexual assault upon a child.

---

"[n]otwithstanding any other limitation of time described in this chapter." We simply note that the quoted language cannot be interpreted to mean that a 10-year limitations period applies to crimes for which prosecution could otherwise be commenced at any time under section 799. Among other things, section 799 is not encompassed within the "notwithstanding" clause of section 801.1, subdivision (b) because it does not set forth a "limitation of time." Rather, section 799 expressly provides there is *no* time limit for commencing a prosecution of the crimes it covers. In addition, interpreting the "notwithstanding" clause of section 801.1, subdivision (b) to impose a 10-year statute of limitations regardless of whether section 799 otherwise applies would yield the absurd results we discuss below, such as imposing a 10-year limitations period for murder when committed during the perpetration of certain sex crimes.

II. *Substantial Evidence Supports the Conviction in Count 13 of Forcible Sodomy.*

Appellant was convicted in count 13 of forcible sodomy committed against Jane Doe No. 1, a violation of former section 286, subdivision (c)(2) (hereafter former section 286(c)(2)).[5] (Former § 286(c)(2), as amended by Stats. 2002, ch. 302, § 3, p. 1202.) On appeal, he claims there was insufficient evidence to support the conviction of forcible sodomy. As explained below, we disagree.

 a. *Facts*

Jane Doe No. 1 testified that she had been subjected to multiple molestations between the ages of six and 10. In describing one specific incident, she testified that when she was nine appellant came into her room and told her he was going to do something "different." Appellant put Vaseline on his penis, placed her on her stomach, got on top of her, and put his penis in her anus. According to Jane Doe No. 1, it hurt "a lot." Even after she told appellant that it hurt, he continued to penetrate her anus with his penis for "a couple minutes," and then told her not to tell anyone. Jane Doe No. 1 explained that she did not tell anyone about the sodomy incident because appellant had previously told her that if she told about the molestations he would get in trouble.

The trial court instructed the jury on the elements of forcible sodomy. As relevant here, the court instructed the jury that, in order to find appellant guilty of forcible sodomy, it had to find that the victim "did not consent to the act" and that appellant "accomplished the act by force or violence, or duress, or menace, or fear of immediate and unlawful bodily injury to someone." The court stated that "[a]n act is accomplished by force if a person uses enough physical force to overcome the other person's will." The court also defined "duress" as follows: " 'Duress' means a direct or implied threat of force, violence, danger, hardship, or retribution that causes a reasonable person to do or submit to something that he or she would not otherwise do or submit to. When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the female minor and the female minor's relationship to [appellant]."

In closing argument, the prosecutor emphasized that appellant did not stop the act of sodomy even after Jane Doe No. 1 complained that it hurt her. The

---

[5] The Legislature amended section 286 effective September 9, 2010. (Stats. 2010, ch. 219, § 6.) As amended, section 286, subdivision (c)(2) is further subdivided into subparts (A) through (D). Because appellant's crime of forcible sodomy was committed in the 2006 to 2007 time period, our inquiry is focused upon the version of section 286 in effect at that time.

prosecutor continued: "Now, this is sort of one of those when you look at this issue of force, remember, for the sodomy and rape, we're just talking about force to show it's against the will of a child. I submit to you, when you start inserting a penis into the anus of a nine-year-old little girl and she cries out that it hurts, I think that's the equivalent of against the will. When you ignore that and stuff your penis in further, that's force." The prosecutor also argued that the jury could rely instead on duress to support the conviction: "You don't even need to get there, because we have this duress. And this is when she's nine, after repeated touching and violations. . . . So I submit under either theory, force or duress, he committed . . . forcible sodomy . . . ."

b. *Analysis*

When a judgment is challenged for lack of evidentiary support, "we must determine only whether, on the record as a whole, any rational trier of fact could find [the defendant] guilty beyond a reasonable doubt. [Citation.] We view the evidence in the light most favorable to the prosecution, and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" (*People v. Griffin* (2004) 33 Cal.4th 1015, 1028 [16 Cal.Rptr.3d 891, 94 P.3d 1089] (*Griffin*).)

 Former section 286(c)(2) provided: "Any person who commits an act of sodomy when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person shall be punished by imprisonment in the state prison for three, six, or eight years." The terms "force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim" are used in the disjunctive in former section 286(c)(2). Thus, a conviction may be upheld if there is substantial evidence the act was accomplished against the victim's will *either* by force, violence, duress, menace, *or* fear of bodily harm.

Appellant contends the evidence is insufficient to support his conviction for forcible sodomy because "there was nothing described beyond the actual sodomy that would suggest appellant was applying any sort of hold, or other pressure to force her into compliance." His argument rests on the premise that a conviction of forcible sodomy must be supported by evidence that the physical force used by the perpetrator was greater than or different from the force used to accomplish the sexual act itself. This premise was applied in the context of forcible lewd acts on a child under age 14, a violation of section 288, subdivision (b), in *People v. Cicero* (1984) 157 Cal.App.3d 465, 484 [204 Cal.Rptr. 582] (*Cicero*), disapproved on other grounds in *People v. Soto* (2011) 51 Cal.4th 229, 248, footnote 12 [119 Cal.Rptr.3d 775, 245 P.3d 410]. In that case, the court held that where the child has suffered no physical harm, the

prosecutor must prove "(1) that the defendant used physical force substantially different from or substantially in excess of that required for the lewd act and (2) that the lewd act was accomplished against the will of the victim." (*Cicero*, at p. 484.) Appellant urges us to apply this same principle to forcible sodomy as defined in former section 286(c)(2). We decline to do so.

In *Griffin, supra*, 33 Cal.4th 1015, our Supreme Court held that the definition of force developed by the *Cicero* court for application in forcible lewd conduct prosecutions did not apply to forcible rape as defined in section 261, subdivision (a)(2). (*Griffin, supra*, 33 Cal.4th at pp. 1018–1019.) The court explained there is a considerable difference between forcible rape and the crime of forcible lewd conduct that is set forth in section 288, subdivision (b)(2). (*Griffin, supra*, at p. 1026.) Section 288 is broken down into forcible and nonforcible lewd acts against a child under age 14. (§ 288, subds. (a) & (b).) " 'Subdivisions (b) [now (b)(1)] and (a) of section 288 on their face draw a distinction between those lewd acts that are committed by force and those that are not.' " (*Griffin, supra*, 33 Cal.4th at p. 1026.) The *Cicero* court's definition of "force" turned on the need to distinguish between forcible and nonforcible lewd acts in section 288. According to the Supreme Court in *Griffin*, "[t]hat same distinction does not arise in the context of the rape statute. The element of force in forcible rape does not serve to differentiate between two forms of unlawful sexual contact as it does under section 288. When two adults engage in *consensual* sexual intercourse, whether with or without physical force greater than that normally required to accomplish an act of sexual intercourse, the forcible rape statute is not implicated. . . . [I]n a forcible rape prosecution the jury determines whether the use of force served to overcome the will of the victim to thwart or resist the attack, *not* whether the use of such force physically facilitated sexual penetration or prevented the victim from physically resisting her attacker." (*Griffin, supra*, 33 Cal.4th at p. 1027.) Thus, the question for the jury in a forcible rape case is "simply whether [the] defendant used force to accomplish intercourse with [the victim] against her will, not whether the force he used overcame [the victim's] physical strength or ability to resist him." (*Id.* at p. 1028.)

The reasoning in *Griffin* was extended to the forcible oral copulation component of aggravated sexual assault on a child in *People v. Guido* (2005) 125 Cal.App.4th 566 [22 Cal.Rptr.3d 826] (*Guido*). The *Guido* court concluded that the term "force" as used in the statute defining forcible oral copulation (former § 288a, subd. (c)(2), now (c)(2)(A)) did not have the specialized meaning ascribed to it by the *Cicero* court. (*Guido, supra*, 125 Cal.App.4th at pp. 575–576.) The court observed, "Unlike sexual abuse of a child by use of force, a specialized definition of force is not necessary to the crime of forcible oral copulation because a different concept of force is not needed to distinguish between two crimes or to give substance to the

Legislature's use of the term 'force,' such as it is in section 288, subdivision (b)(1)." (*Guido, supra*, 125 Cal.App.4th at p. 576.) The court also noted that "[c]onsensual oral copulation, with or without physical force greater than that normally required to accomplish the act, is not unlawful except when accomplished under circumstances violative of section 288a." (*Ibid.*)

■ The reasoning employed in *Griffin* and *Guido* applies equally to the crime of forcible sodomy as defined in former section 286(c)(2) (currently codified in § 286, subd. (c)(2)(A)). Sodomy is not unlawful except under the circumstances described in section 286. As with forcible rape, the gravamen of the crime of forcible sodomy is a sexual act accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury. As with forcible rape, it is only when the perpetrator uses force to commit the act against the other person's will that an otherwise lawful act becomes unlawful. Unlike the statute defining forcible lewd acts against a child (§ 288, subd. (b)(1)), the statute defining forcible sodomy (former § 286(c)(2)) does not simply add the element of force to an act that is already a criminal offense. Thus, there is no need to use a specialized definition of "force" to differentiate between nonforcible and forcible forms of sodomy because, absent circumstances not relevant here, consensual, nonforcible sodomy is not a criminal offense.[6]

Our conclusion is consistent with the approach taken in *Guido* with regard to forcible oral copulation. Indeed, aside from the definition of and references to the particular sexual act (i.e., sodomy or oral copulation), the oral copulation statute considered by the *Guido* court—former section 288a, as amended by Statutes 2002, chapter 302, section 4, page 1204—is *identical* to the sodomy statute at issue here, former section 286, as amended by Statutes

---

[6] Certain forms of consensual or nonforcible sodomy do constitute a crime. (See, e.g., former § 286, subd. (c)(1), as amended by Stats. 2002, ch. 302, § 3, p. 1202 [making it a crime to engage in sodomy with a child under 14 when the victim is more than 10 years younger than the perpetrator].) The existence of such offenses does not change our analysis. Forcible sodomy as defined in former section 286(c)(2) is distinguished from other forms of sodomy offenses by more than just the application of force to overcome the victim's will. Thus, there remains no need to rely on a specialized definition of "force" to distinguish between forcible sodomy and other sodomy offenses. We observe that the current version of section 286 makes it a crime to commit an act of sodomy against a person under 14 years of age when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person. (§ 286, subd. (c)(2)(B).) One might argue that the application of force is what differentiates the crime in section 286, subdivision (c)(2)(B) from the offense in section 286, subdivision (c)(1), which makes it a crime to engage in an act of sodomy with a child under 14 and more than 10 years younger than the perpetrator. (We note the requirement that the victim be more than 10 years younger than the perpetrator is found only in the nonforcible crime and not in the forcible crime.) We express no opinion on whether the term "force" as used in section 286, subdivision (c)(2)(B) has a specialized meaning. Our holding is limited to forcible sodomy as defined in former section 286(c)(2), which is currently codified in section 286, subdivision (c)(2)(A).

2002, chapter 302, section 3, page 1202. It should come as no surprise that the meaning of "force" as that term is used in the forcible oral copulation statute (§ 288a, subd. (c)(2)(A)) is no different from the term's meaning in the forcible sodomy statute (§ 286, subd. (c)(2)(A); former § 286(c)(2)).

For the foregoing reasons, we reject appellant's contention that the force used to commit a violation of former section 286(c)(2) must be greater than or different from the force used to engage in the act of sodomy. Rather, consistent with *Griffin* and with the instruction given to the jury in this case, the prosecutor was merely required to prove that the act of sodomy was accomplished by enough physical force to overcome the victim's will. (*Griffin, supra,* 33 Cal.4th at p. 1028.)

Here, the jury could have reasonably concluded that appellant's act of positioning himself on top of Jane Doe No. 1 and refusing to stop when she told him he was hurting her combined to constitute the requisite amount of force to overcome her will, bearing in mind that Jane Doe No. 1 was a nine-year-old girl at the time and appellant was described as a very large man weighing 290 pounds. We therefore reject appellant's challenge to the sufficiency of the evidence on the ground there was insufficient evidence of force.

 Furthermore, even if the evidence of force were insufficient to support a conviction for forcible sodomy, there was nonetheless sufficient evidence to show that appellant used duress to overcome the victim's will. As noted above, the court instructed the jury with the definition of duress and the prosecutor specifically relied on a duress theory as an independent basis supporting the forcible sodomy conviction. "Duress" includes " ' "a direct or implied threat of . . . hardship or retribution sufficient to coerce a reasonable person of ordinary sensibilities to . . . perform an act which otherwise would not have been performed . . . ." ' [Citation.]" (*People v. Perez* (2010) 182 Cal.App.4th 231, 243 [105 Cal.Rptr.3d 749]; see also *People v. Schulz* (1992) 2 Cal.App.4th 999, 1005 [3 Cal.Rptr.2d 799].) "Duress can arise from various circumstances, including the relationship between the defendant and the victim and their relative ages and sizes. [Citations.] 'Where the defendant is a family member and the victim is young, . . . the position of dominance and authority of the defendant and his continuous exploitation of the victim' is relevant to the existence of duress. [Citation.]" (*People v. Schulz, supra,* at p. 1005.)

In this case, Jane Doe No. 1's father subjected her to continuous acts of sexual molestation when she was between the ages of six and 10. He told her that she should not tell anyone about the molestation because he could go to prison. On this particular occasion, he put her on her stomach, got on top of

her, and penetrated her anus with his penis. He continued to sodomize her even though she complained that it hurt. Under the circumstances, appellant "took advantage not only of his psychological dominance as an adult authority figure, but also of his physical dominance to overcome her resistance to molestation. This qualifies as duress. [Citations.]" (*People v. Schulz, supra*, 2 Cal.App.4th at p. 1005.)

In sum, there was substantial evidence to demonstrate that appellant committed forcible sodomy against Jane Doe No. 1 by both force *and* duress, either of which would be sufficient to uphold the conviction.

III., IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is affirmed.

Pollak, J., and Jenkins, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 20, 2012, S202074.

---

*See footnote, *ante*, page 961.