Filed 6/28/16  P. v. Carmalt CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>WALLACE SAMUEL CARMALT,<br><br>　　Defendant and Appellant. | H038402<br>(Santa Clara County<br>Super. Ct. No. F1035060) |

Over the course of two trials, Wallace Samuel Carmalt was found guilty of one count of forcible lewd conduct and five counts of aggravated sexual assault on a child under the age of 14.  He challenges certain evidentiary rulings, jury instructions, and the sufficiency of the evidence to support the aggravated sexual assault convictions resulting from the second trial.  Finding no error, we will uphold those convictions.  We will further uphold the denial of defendant's motion for a new trial on forcible lewd conduct under the doctrine of judicial estoppel.  We will correct errors in the trial court's fees and penalty assessment calculations, and affirm the judgment as modified.

## I.  TRIAL COURT PROCEEDINGS

### A.　BACKGROUND

Defendant was charged by information with six counts of aggravated sexual assault (rape) of Angela Doe, a child under 14 years of age and more than 10 years

younger than defendant (Pen. Code, §§ 269, 261, subd. (a)(2)[1]; counts 1 through 6) and 13 counts of forcible lewd conduct on Angela Doe, a child under 14 years of age (§ 288, subd. (b)(1); counts 7 through 19). The information alleged one count of aggravated sexual assault for every year between Angela's eighth and fourteenth birthdays. The forcible lewd conduct charges were identical—all alleged to have occurred between Angela's eighth and fourteenth birthdays. A jury found defendant guilty of one count of forcible lewd conduct (count 7) and not guilty of the aggravated sexual assault alleged to have occurred when Angela was eight (count 1). The jury was unable to reach unanimous verdicts on the remaining counts and a mistrial was declared as to those counts.

The case was retried before a different judge after the judge who presided over the first trial retired. Defendant represented himself at both trials. Defendant moved pretrial to dismiss the deadlocked counts on double jeopardy grounds. He argued that all remaining counts should be dismissed because the first jury had not attributed a specific act to the count 7 forcible lewd conduct verdict, and he supported that position with declarations from jurors number 4 and number 9 stating that no juror assigned or designated any specific act to that count.[2] The court denied defendant's motion as to the aggravated sexual assault charges (counts 2 through 6), but the prosecutor conceded defendant's position as to the surviving counts of forcible lewd conduct (counts 8 through 19), and the court dismissed those counts.

Defendant was found guilty in the second trial of the five remaining aggravated sexual assault charges. He was sentenced to consecutive 15-years-to-life terms on each count, for a total term of 75 years to life. He received eight years on count 7 stayed

---

[1] Undesignated statutory references are to the Penal Code.

[2] Both jurors also referenced "discussion with my fellow jurors" about defendant's possible sentence, including counseling, and about the possibility that defendant would not be retried if he were found guilty of only one count.

2

pursuant to section 654. The court imposed a $10,000 restitution fund fine (§ 1202.4, subd. (b)), a $10,000 suspended parole revocation restitution fine (§ 1202.45), a $150 court security assessment (§ 1465.8, subd. (a)(1)), a $150 court facilities assessment (Gov. Code, § 70303), a $129.75 criminal justice administrative fee (Gov. Code, § 29550, subd. (c)), a $200 sex offense conviction fine (§ 290.3), and $600 in penalty assessments. The court made a "general order of restitution," but that order was not reflected in the minutes or abstract of judgment.[3]

Defendant moved for a new trial on several grounds including juror misconduct during the first trial to challenge the validity of the count 7 verdict. Relying on the same declarations used to support his double jeopardy challenge (plus a third similar declaration executed after that motion was heard), defendant argued that the first jury had committed misconduct in several ways including failure to follow the instruction requiring unanimity as to a specific act supporting the verdict on count 7. The prosecutor argued in opposition that defendant's declarations were inadmissible under Evidence Code section 1150. The prosecutor also rebutted defendant's declarations with declarations from five other jurors who stated that the jury had unanimously agreed on a specific act supporting count 7.[4] That motion was denied. In concluding that the juror misconduct allegations did not provide a basis for a new trial, the court noted that

---

[3] We understand the general restitution order to be an order reserving jurisdiction to determine the amount of victim restitution at a later time. (See *People v. Guardado* (1995) 40 Cal.App.4th 757, 762–763. We deem the order's omission from the minutes and abstract of judgment a clerical error. (*People v. Hong* (1998) 64 Cal.App.4th 1071, 1075.) We will order the trial court to amend those documents to reflect that order. (*Id*. at pp. 1084–1085.)

[4] According to three of the prosecution's declarations, juror number 9 was concerned during deliberations that defendant was being "railroaded" and "thrown under the bus." Two of those jurors stated that juror number 9 expressed his reluctance to vote guilty because he did not want defendant to go to prison. A fourth juror wrote that an alternate juror said one of the jurors tried to recruit other jurors during cigarette breaks to vote not guilty.

3

Evidence Code section 1150 bars statements in juror declarations about the misuse of the jury unanimity instruction.

**B.  SECOND TRIAL EVIDENCE**

**1.  Prosecution's Case**

**a.  Charged conduct**

Angela testified that she was born in February 1991.  When she was five or six, her father and his girlfriend (who later became Angela's stepmother) rented a room in their home to defendant.  Defendant moved with the couple twice and lived with them until 2006.  Angela spent every other weekend and every Wednesday night at her father's home until she was 13.  During that time, her father was disabled and addicted to painkillers, and her stepmother was absent from the house for extended periods of time, working and caring for her elderly parents.  As a consequence, Angela was left alone and spent most of her time with defendant, who was 29 years her senior.  Defendant was nice to Angela:  They hung out, played games, went for food, swam, played karaoke, and told jokes.  He was there for her when she needed help.

When Angela was about seven, defendant began showing her pornographic films. When she was eight or nine, defendant initiated sexual contact with Angela, having her simulate the pornographic acts with him.  Defendant would put pornography on the television or computer, take off Angela's clothes, and rub his penis on the inside of her vaginal lips in one of three positions until he would ejaculate.  This happened in defendant's bedroom during every visit with her father until Angela was 13 and stopped the visits because she did not want to be around defendant.  Although Angela was not scared of defendant, she did not understand what was going on and she was scared of the situation.  Angela never removed her own clothes or positioned herself; rather, she was maneuvered by defendant, who was a lot bigger than her.  She never told him "no," and he did not cause her physical pain.  He told her not to tell anyone, and she did not tell

4

because she thought it was her fault. Although she hated defendant and she knew his behavior was wrong, she returned to his bedroom because her "body still liked it."

One time in the garage Angela and her friend Kiki masturbated defendant's penis with their hands.[5] Kiki was also present when defendant "did it" to Angela in his room.

Angela disclosed the molestation to a friend's father, who testified that he had been extremely concerned about Angela's behavior, including self-cutting, alcohol and drug use, and depression. He met Angela when she was 16, observed her in an "enormous amount of pain," and had expressed his concern for several months before she made her disclosure. Another year passed before she agreed to go to the police.

Angela's father recalled defendant commenting that he wanted to move to a state where marrying a 13 or 14 year old girl was legal. Angela's stepmother recalled defendant considering marriage to a 12, 13, or 14 year old to be perfectly normal.

### b. Uncharged conduct (propensity evidence)

Defendant lived with his sister for extended periods of time when he was in his twenties. His sister's stepdaughter Nicole testified that she was born in 1978 and met defendant when she was eight. Defendant was flirtatious, told Nicole he was interested in her romantically, and when she was 12 he said he loved her, would marry her, and she would be the mother of his children. When Nicole was 12 or 13, her stepmother told defendant he could not be in the home alone with her. Nicole testified at age 33 that she knew defendant found her sexually attractive when she was 8, 9, and 10 years old.

Nicole identified a picture of herself in a collage found during a search of defendant's residence. The picture was taken when she was about 13, and her head was superimposed on a wedding dress. The collage was found in an envelope also containing a four-page composition titled "Why I wish to marry Nicole." In that writing defendant

---

[5] Kiki testified that she watched Angela masturbate defendant's penis and that occurred on more than one occasion when she and Angela were 10 or 11. She recalled Angela looking frightened and saying "I don't want to do this."

5

described meeting Nicole:  "There while visiting my sister Ethel's house I met for the first time a pretty young girl who was then at the age of eight and who was the only one present amongst a group of people who was dressed up very nicely and wearing a fancy laced white dress with a pink ribbon and her hair fixed quite nice.  At that precise moment when I for the first time looked at her, I heard a voice say 'that is your bride.' "  He also wrote "I am thoroughly in control of my passions.  …  Though one day I have hope to be permitted to unbridle the passions that I have for Nicole.  …  I remain respectful to the wishes of her guardians and the laws of the land.  …  To her my love shall always be faithful, the dearest girl I know, Nicole."  Defendant had acknowledged creating the collage and writing when Nicole was 12 or 13.

### 2.    Defendant's Case

Several character witnesses testified that they had hired defendant as a handyman, and none had observed any conduct suggesting that he was a child molester or rapist. Angela's stepmother's brother, who had attended family events with defendant, had never observed any behavior suggesting defendant was a child molester or rapist. Defendant had fathered a child in 2007.  The child's maternal step-grandmother Kay had observed nothing to indicate defendant was a rapist or molester.  Kay also testified that her daughter, Karen, had met defendant when she was a mentally disadvantaged 20-year-old who acted 15 or 16.

Angela's stepmother testified that defendant liked young girls and that Karen was mentally 14 or 15 when she and defendant met.  Angela's stepmother acknowledged having a close and at times emotionally dependent relationship with defendant over the years.

Defendant argued that Angela fabricated the allegations because she was jealous of defendant's relationship with Karen.  He also argued that the prosecution had not proved that the sexual acts were committed by force or duress.

6

## II. DISCUSSION

**A.    THE NEW TRIAL MOTION**

### 1.    Juror Declarations

Evidence Code section 1150—governing the admissibility of juror declarations to challenge a verdict's validity—provides: "[A]ny otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." In construing Evidence Code section 1150 shortly after its enactment, our Supreme Court distinguished between "proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved." (*People v. Hutchinson* (1969) 71 Cal.2d 342, 349.) *Hutchinson* explained that "[t]he only improper influences that may be proved under section 1150 to impeach a verdict … are those open to sight, hearing, and the other senses and thus subject to corroboration." (*Id*. at p. 350.)

Defendant supported his new trial motion with three juror declarations, each containing an identical paragraph 4. He argues that the first sentence of that paragraph— "Also, during deliberations, neither I, the jury foreman, nor any of the other jurors discussed assigning or designating any specific act to Count 7"—alleges objective conduct under *Hutchinson*.[6] Thus, defendant continues, the court abused its discretion by failing to consider that statement in ruling on the new trial motion. According to

[6] Paragraph 4 continued: "When we unanimously agreed to find the defendant guilty of Count 7 it was not based on a specific act to which we all agreed, but merely as a violation of PC§288(b)(1). When we decided the verdicts on counts 7-19, we were only voting on whether or not any PC§288(b)(1) violation had occurred involving the defendant and his accuser rather than on a specific act."

7

defendant, the statement shows that the jurors failed to reach a unanimous verdict regarding count 7 as required by the jury instructions, and the failure to follow the unanimity instruction constitutes prejudicial jury misconduct. Defendant argues that the prosecution's opposing declarations are subjective mental process inadmissible under Evidence Code section 1150.

### 2. Judicial Estoppel

We requested supplemental briefing on whether the doctrine of judicial estoppel bars defendant from seeking a new trial on count 7 based on an inconsistent position he took in his double jeopardy motion. After considering the parties' arguments, we conclude that the doctrine applies here. (*Green v. Superior Court* (1985) 40 Cal.3d 126, 139 ["the failure to have urged [a] theory below does not preclude our reliance on it to affirm the trial court's ruling."].)

Judicial estoppel is an equitable doctrine that " 'precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position.' " (*Aguilar v. Lerner* (2004) 32 Cal.4th 974, 986 (*Aguilar*).) The doctrine applies in both civil and criminal cases. (See *Aguilar*; *Zedner v. United States* (2006) 547 U.S. 489; *Murphy v. Commonwealth of Massachusetts* (1900) 177 U.S. 155.) " 'The doctrine's dual goals are to maintain the integrity of the judicial system and to protect parties from opponents' unfair strategies.' " (*Aguilar*, at p. 986.) The elements of judicial estoppel are " '(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake.' " (*Id*. at pp. 986–987.)

Defendant acknowledges that four elements are present here. He argued two positions during the course of his criminal prosecution: (1) that the count 7 verdict precluded retrial on the other 12 forcible lewd act counts based on the prohibition against

8

double jeopardy, and (2) that prejudicial juror misconduct invalidated the count 7 verdict. The double jeopardy motion was successful and not attributable to ignorance, fraud, or mistake. But defendant presses that the doctrine's remaining element, which requires the "conflicting positions [to] be clearly inconsistent so that one necessarily excludes the other" (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 182), is not satisfied here.

Although a verdict was necessary to the double jeopardy motion, defendant argues that the type of verdict was inconsequential because the motion could have been supported by either a guilty or a not guilty verdict. Accordingly, he contends that the double jeopardy motion relied only on the fact that the jury rendered a verdict on count 7, not on the fact that the verdict was for guilt. According to defendant, to be totally inconsistent with his double jeopardy position, his new trial motion would have had to argue for "no verdict at all for count 7," not for a new trial which would allow a new verdict. But in the double jeopardy motion, defendant had to take the position that the guilty verdict on count 7 was valid. By arguing in the new trial motion that the lack of unanimity rendered the same verdict constitutionally invalid, defendant's position was wholly inconsistent with the position he advanced in the double jeopardy motion, which resulted in the dismissal of 12 counts of forcible lewd conduct. Defendant's remedy for the claimed juror misconduct—a new trial as opposed to no verdict—has no bearing on the inconsistent positions he took with respect to the verdict's validity. Defendant could not have prevailed in the new trial motion without having the verdict deemed invalid, and he could not have prevailed in the double jeopardy motion without the same verdict being valid.

Defendant does not challenge this court's discretion to apply judicial estoppel on appeal. Rather, he argues that the doctrine should not apply because he did not intend to be self-contradictory or to obtain an unfair advantage. We view the record differently. Before the second trial, defendant could have used his juror declarations to seek a new

9

trial on count 7 based on juror misconduct (the absence of unanimity) invalidating the verdict. But he could not have moved for a new trial based on invalidity and at the same time moved for dismissal based on double jeopardy. By bringing his double jeopardy motion, defendant made a tactical decision to use the valid verdict to obtain dismissal of the 12 remaining forcible lewd conduct counts instead of seeking to invalidate the verdict for lack of unanimity which would have resulted in a retrial on all 13 forcible lewd conduct counts. Allowing defendant now to change his position after retrial would provide an unfair advantage because he cannot be retried on the dismissed counts, a recourse that would have been available to the prosecution had defendant not brought and prevailed on his double jeopardy motion.

Defendant argues that we should remand for the trial court to exercise its discretion to apply the doctrine in the first instance. We decline to do so. This case has a lengthy history in the superior court, and we are not inclined to add to that court's duties an inquiry that we are authorized and able to resolve on the record before us. We therefore do not reach the merits of defendant's argument on appeal that the count 7 verdict should be reversed based on the jury's failure to deliberate and reach unanimous agreement on the specific act supporting the verdict.

## B. SECOND TRIAL CHALLENGES

### 1. Specific Acts Evidence

Defendant argues, and the Attorney General concedes, that the trial court erred by not allowing defendant to present evidence of specific instances of conduct to rebut the prosecution's evidence showing defendant's propensity for sexual misconduct with young girls. The prosecution's propensity evidence was admitted under Evidence Code section 1108. That section provides an exception to the inadmissibility of character evidence offered to prove a person's conduct under Evidence Code section 1101. Evidence Code section 1108 applies to criminal actions for sexual offenses, and it allows for admissibility of other sexual offenses to show conforming conduct. In *People v.*

10

*Callahan* (1999) 74 Cal.App.4th 356, 379, recently cited with approval by the California Supreme Court (*People v. Cottone* (2013) 57 Cal.4th 269, 288), the court held that a defendant is permitted to introduce any of the three types of character evidence—opinion, reputation, and specific instances of conduct—to rebut evidence introduced by the prosecution under Evidence Code section 1108. Accordingly, we will accept the Attorney General's concession that the trial court erred by excluding defendant's evidence of specific instances of conduct to rebut the prosecution's propensity evidence, and we will assess the error for prejudice.

We analyze evidentiary error under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), which provides for reversal only when "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of error." (Evid. Code, § 354 [precluding relief from judgment unless the erroneous exclusion of evidence "resulted in a miscarriage of justice"]; *People v. McAlpin* (1991) 53 Cal.3d 1289, 1311 [applying *Watson* harmless error review to erroneous exclusion of evidence].) On this record, it is not reasonably probable that defendant would have received a more favorable result had his character witnesses testified to specific instances when defendant behaved appropriately in the presence of girls.[7]

Defendant presented several witnesses who testified that he did not have character traits indicative of a rapist or child molester. One witness described that she met defendant when she hired him for a construction job around the time her daughter graduated from high school. Defendant spent a lot of time on her property and she observed no behavior causing her concern that he was a molester or child rapist. Another

---

[7] Defendant has not identified with any particularity the specific instances of conduct excluded by the erroneous evidentiary ruling. He made an offer of proof that his witnesses would testify to "[s]pecific acts of good conduct that they've observed." He proffered testimony that he worked in the witnesses' homes around children, that the witnesses observed his interaction with children, and that his behavior gave no indication that he was a pedophile or a rapist.

11

witness met him as a handyman. She had observed his behavior and interaction with her family, and she was never concerned that he might be a sexual predator, rapist, or molester. More than once she had referred defendant to other families with children, and she had never received any reports from those families concerning his behavior in their homes.

A third witness also met defendant as a handyman. Defendant spent lengthy periods of time in her home and she never observed any behavior suggesting he was a rapist or a child molester. She had recommended defendant to friends with children and those friends never reported any inappropriate behavior. A fourth witness testified that defendant had worked on several properties where her relatives, including children, lived. No one ever reported trouble and she never observed anything suggesting defendant had an interest in raping or molesting young girls. Angela's stepmother's brother testified to knowing defendant for about 20 years. He had attended family events where defendant and children were present, and he never observed inappropriate behavior suggesting defendant was interested in molesting or raping children. Finally, Kay, the stepmother of defendant's ex-girlfriend Karen and step-grandmother of defendant's daughter, testified that she had known defendant for seven years, and his behavior had never suggested that he might be a rapist or a molester.

We find no prejudice here because the opinion testimony of defendant's character witnesses implied that they had observed only appropriate conduct on defendant's part. (See *People v. Callahan*, *supra*, 74 Cal.App.4th at p. 380.) Thus, little would have been added had the witnesses elaborated on specific instances on which they based their opinion testimony. Further, the prosecution's case was strong. Angela was articulate and her testimony was internally consistent. Her testimony was corroborated by the testimony of Kiki, Nicole, Angela's father, and the father of Angela's friend to whom she made her disclosure. It was also corroborated by the collage and writing defendant created when Nicole was a girl, and by Angela's stepmother, a defense witness who

12

testified that defendant liked young girls, that defendant's presence disturbed Angela, and that she believed Angela who, because of defendant, had become a broken child.

Defendant argues that the right to introduce admissible evidence is a state law entitlement protected by the federal due process clause. Specifically, defendant argues that the California Supreme Court, in *People v. Ashe* (1872) 44 Cal. 288 (*Ashe*), "created an entitlement that a defendant may introduce evidence of his good character as a defense." In *Ashe*, the California Supreme Court rejected a jury instruction that good character evidence was "entitled to no weight, except in doubtful cases." (*Id.* at p. 290.) In so ruling, the court explained that good character "is a circumstance tending, in a great or less degree, to establish [a defendant's] innocence, and it is not to be put aside by the jury, in order to ascertain if the other facts and circumstances, considered by themselves, do not establish [] guilt beyond a reasonable doubt." (*Id.* at p. 291.)

*Ashe* foretold what is now well-established and recognized in the Evidence Code—that character evidence is relevant to prove or disprove guilt. (Evid. Code, § 1102.) But *Ashe* does not hold that a defendant has an unfettered right to introduce character evidence, and we do not view that case as creating a due process interest in the introduction of evidence beyond that recognized in the right to a fair trial. (*Strickland v. Washington* (1984) 466 U.S. 668, 684–685 ["The Constitution guarantees a fair trial through the Due Process Clauses[.]"].) When evidentiary error occurs, due process is violated only when that error makes the trial fundamentally unfair. (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

As we have detailed, defendant offered a vigorous defense through character witnesses. In light of the extensive good character testimony, the excluded evidence was not central to defendant's claim of innocence, but would have provided only further foundation for the witnesses' opinions that defendant did not possess the character trait of a rapist or child molester. Little value would have been added had defendant been able to ask character witnesses about specific interactions between himself and young children

13

because observations of appropriate interaction with children were implicit in the witnesses' testimony. For these reasons, the trial court's erroneous evidentiary ruling did not result in a fundamentally unfair trial.

In supplemental briefing, defendant argues the evidentiary error deprived him of a meaningful opportunity to present a complete defense. Defendant presented several character witnesses to rebut the prosecution's propensity evidence. Even if we were to assume the court's evidentiary error amounted to a violation of Sixth Amendment right to compulsory process,[8] for the reasons we have already explained, that error would be harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18; *Crane v. Kentucky* (1986) 476 U.S. 683, 691.)

## 2. Substantial Evidence of Force or Duress

The jury convicted defendant of five counts of aggravated sexual assault of a child predicated on defendant committing rape "against [the child's] will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the [child]." (§§ 269, subd. (a)(1), 261, subd. (a)(2).) The terms "force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim" are used in the disjunctive. Thus, a conviction may be supported by substantial evidence of any of those provisions. (*People v. Hale* (2012) 204 Cal.App.4th 961, 976.)

Defendant argues that insufficient evidence supports the five aggravated sexual assault verdicts. Specifically, he contends that substantial evidence fails to establish that he committed sexual intercourse against the will of Angela using force or duress. "When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether

_____

[8] We reject the Attorney General's assertion that defendant forfeited this claim by failing to identify the constitutional error below. We understand defendant to be arguing that the evidentiary error had the additional legal consequence of violating the Sixth Amendment right to compulsory process. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 408, fn. 7.)

14

it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) We will affirm a conviction if " ' "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (*People v. Alvarez* (1996) 14 Cal.4th 155, 224, italics omitted.)

Substantial evidence supports the prosecution's theory that Angela's will was overcome by defendant's physical use of force. The evidence shows each time defendant sexually assaulted Angela, he removed her clothes and underwear, moved her into a sexual position, spread her legs with his hands, and held or moved her body as he rubbed his penis inside her labia. Angela never removed her own clothes, and her position was always controlled by defendant. Defendant was 29 years older and physically larger than Angela.

Substantial evidence also supports a finding that the rapes were committed against Angela's will by duress. Duress, as an element of a sex offense against a minor, means "a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable [child] of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted." (*People v. Pitmon* (1985) 170 Cal.App.3d 38, 50.) The existence of duress depends on the total circumstances including the child's age, relationship to defendant, and relative physical vulnerability. (*People v. Superior Court* (*Kneip*) (1990) 219 Cal.App.3d 235, 238.) The record contains considerable evidence showing defendant psychologically coerced Angela to engage in sexual acts. Defendant began abusing Angela at a very young age, and she remained physically and emotionally vulnerable as the abuse persisted. Defendant was an unyielding source of attention, companionship, meals, and support to Angela, filling a void created by her absent parents. Defendant told Angela not to tell anyone, including her father and stepmother.

15

Angela testified that she was not scared of defendant, but she was scared of the situation and she blamed herself. Defendant's age, size, and relationship with Angela and her family all support an implied threat constituting duress.

### 3. Jury Instructions

A lesser offense is necessarily included within a charged offense "if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 117.) The parties do not dispute that unlawful sexual intercourse with a minor (statutory rape) is a lesser included offense of aggravated sexual assault (rape) of a child under either test.[9]

Defendant argues that the trial court committed error by not sua sponte instructing the jury on the lesser included offense of statutory rape. A trial court must instruct sua sponte on any lesser included offense "which find[s] substantial support in the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 162. " 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could … conclude[]" ' that the lesser offense, but not the greater, was committed." (*Ibid.*) With that standard in mind, we conclude that the failure to instruct on the lesser

---

[9] The elements of aggravated sexual assault (rape) of a child are (1) sexual intercourse with a non-spouse, (2) against the victim's will by "force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another," (3) a victim under 14 years old, and (4) a defendant at least 7 years older than the victim. (§§ 269, 261, subd. (a)(2).) Statutory rape is defined as "an act of sexual intercourse accomplished with a person who is not the spouse of the perpetrator, if the person is a minor." (§261.5, subd. (a).) Because aggravated sexual assault (rape) of a child cannot be committed without committing an act of sexual intercourse with a non-spouse minor, statutory rape is a lesser-included offense of aggravated sexual assault/forcible rape under the statutory elements test. Statutory rape is also a lesser-included offense under the accusatory pleading test here because counts 2 through 7 alleged that defendant committed a violation of rape under section 261, subdivision (a)(2) upon Angela who was under the age of 14.

16

included offense was error. (*People v. Cole* (2004) 33 Cal.4th 1158, 1215 [reviewing de novo whether the trial court was required to instruct on the lesser included offense].) We also conclude, however, that defendant has failed to show prejudice from the error because it is not reasonably probable that a jury would have convicted him of statutory rape instead of forcible sexual assault had they been presented with that option. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

No reasonable jury would have found an absence of force or duress on this record.[10] Defendant was physically larger and significantly older than Angela. Angela relied on defendant, who lived in her father's home, for food, companionship, and support. Defendant exposed Angela to pornography when she was six or seven, and he was regularly raping her by the time she was nine. Defendant physically manipulated Angela into sexual positions, and she was scared of the situation. Defendant told her not to tell anyone, and she did not tell because she thought the abuse was her fault. Angela hated defendant and engaged in self-destructive behavior for several years before finally disclosing the abuse. Notwithstanding that Angela entered defendant's room freely and at times "liked the feeling," the rapes would not have occurred but for defendant's physical and psychological manipulation of a vulnerable child.

### 4.    Cumulative Error

We reject defendant's cumulative error argument. We find no prejudice from the trial court's errors viewed separately or collectively, and our examination of the entire record shows no miscarriage of justice (Cal. Const., art. VI, § 13) or due process violation.

---

[10] Defendant argues that the first trial's deadlock demonstrates that evidence of force or duress was far from overwhelming. But the juror declarations in the record do not show disagreement among the jurors regarding force or duress. The declarations reveal a minority of jurors concerned with the possibility defendant would be sentenced to prison and speculating as to whether he would be retried if he were only found guilty of one of the 19 charged offenses.

17

## C.    ERRONEOUS ASSESSMENTS

The trial court imposed $600 in penalty assessments without identifying the individual assessments supporting that figure. The parties agree that $600 is incorrect, and they further agree to imposition of the following mandatory penalty assessments: $200 under section 1464, $40 under section 1465.7, $70 under Government Code section 70372, and $140 under Government Code section 76000. The parties agree that penalty assessments under Government Code sections 76000.5 and 76104.7 cannot be imposed because those assessments took effect after defendant committed the offenses. (*People v. Voit* (2011) 200 Cal.App.4th 1353, 1374.)

The parties disagree whether imposition of the Government Code section 76104.6 penalty assessment, effective November 3, 2004, can be imposed without violating ex post facto principles. Defendant committed four of the five aggravated sexual assaults before February 2004 (counts 2 through 5), and the fifth assault (count 6) sometime between February 2004 and February 2005. The forcible lewd act (count 7) occurred sometime between February 1999 and February 2005.

Counts 2 through 5 cannot serve as a basis for a Government Code section 76104.6 penalty assessment because those offenses occurred before the assessment's November 3, 2004 effective date. Nor can count 6 or 7 support the assessment because nothing in the record establishes that those convictions were based on acts occurring after November 3, 2004. Accordingly, imposition of the Government Code section 76104.6 penalty assessment would violate the prohibition against ex post facto laws.

We also note errors in the trial court's calculation of court security (§ 1465.8) and facilities assessments (Gov. Code, § 70373). (*People v. Woods* (2010) 191 Cal.App.4th 269, 272 [court security and facilities assessments are mandatory].) Those assessments are imposed on each conviction, including convictions stayed under section 654. (*People v. Sharret* (2011) 191 Cal.App.4th 859, 865; *People v. Crittle*

18

(2007) 154 Cal.App.4th 368, 370–371.)  The court security assessment is $40 per conviction (§ 1465.8) and the facilities assessment is $30 per conviction (Gov. Code, § 70373).  For the six convictions here, the court should have imposed a $240 court security assessment (instead of $150) and a $180 facilities assessment (instead of $150).  In supplemental briefing, the parties recognize our authority to correct unauthorized assessments, and we will do so.  (*In re Ricky H*. (1981) 30 Cal.3d 176, 191; *People v. Stewart* (2004) 117 Cal.App.4th 907, 911–912.)

## III.  DISPOSITION

The judgment is modified to reflect imposition of a $240 court security assessment (Pen. Code, § 1465.8, subd. (a)(1)), a $180 facilities assessment (Gov. Code, § 70373), and the following penalty assessments:  (1) a $200 state penalty assessment (Pen. Code, § 1464, subd. (a)(1)); (2) a $40 state surcharge (Pen. Code, § 1465.7); (3) a $70 court construction penalty (Gov. Code, § 70372); and (4) a $140 additional penalty (Gov. Code, §76000).  As modified, the judgment is affirmed.

The superior court clerk is directed to prepare and transmit to the Department of Corrections and Rehabilitation a corrected abstract of judgment and minutes reflecting our disposition, including the corrected court security and facilities assessments, and the amount of and statutory basis for each penalty assessment.  The corrected abstract and minutes also shall include the trial court's general restitution order.

_____

Grover, J.

**WE CONCUR:**

_____

Rushing, P.J.

_____

Márquez, J.