Filed 2/14/25  In re R.R. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re R.R., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, Plaintiff and Respondent, v. R.R., Defendant and Appellant. | F086909 (Super. Ct. No. 22JL-00137A) OPINION |

## THE COURT*

APPEAL from a judgment of the Superior Court of Merced County.  Mark V. Bacciarini, Judge.

Courtney M. Selan, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary, Lewis A. Martinez and Jesica Gonzalez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*        Before Peña, Acting P. J., Meehan, J. and Snauffer, J.

# INTRODUCTION

Following contested jurisdictional and dispositional hearings, the juvenile court sustained allegations that minor R.R. (minor) committed rape and forced oral copulation against victim A.P. The court found not true additional allegations of two misdemeanor sexual batteries against victim E.R. (Pen. Code, § 243.4, subd. (e)(1); counts 3, 4). Minor was declared a ward of the juvenile court under Welfare and Institutions Code section 602,[1] and the court committed him to a secure youth treatment facility (SYTF) for a baseline term of four years with a maximum term of confinement of five years eight months and eight days, including credit of 152 days of precommitment custody.

Minor argues there is insufficient evidence to sustain the charges for forcible rape and forcible oral copulation, the juvenile court abused its discretion by failing to consider a less restrictive placement, minor's precommitment custody credits were improperly applied to his maximum term of confinement under section 875, subdivision (c)(1) (section 875(c)(1)), instead of his baseline term under section 875, subdivision (b)(1) (section 875(b)(1)), and section 875(c)(1)(C)'s requirement that precommitment custody credits be applied to the maximum term of confinement under section 875(c), violates equal protection principles.

As we are unpersuaded by each of minor's arguments, we affirm the juvenile court's jurisdictional findings and dispositional order.

## FACTUAL BACKGROUND

### I.     Wardship Petition

On November 10, 2022, the People filed a juvenile wardship petition, which was amended on December 2, 2022, alleging minor committed one count of forcible rape and one count of forcible oral copulation against victim A.P., and two counts of misdemeanor

---

[1]     Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

sexual battery against victim E.R.  A contested jurisdictional hearing was held in June 2023.

## II.     Jurisdictional Hearing Testimony

### A.     A.P.'s Testimony

In November 2021, A.P. was 17 years old, and she was working part-time at a fast food restaurant while completing high school.  Minor, who was also 17 years old at the time, started working at the same restaurant about a month after A.P., and they worked some shifts together.  Minor became shift leader shortly after starting.  Although they attended the same high school, A.P. first met minor at work.

During the course of working together between November 2021 and March 2022, A.P. testified minor forced her to orally copulate him multiple times in the bathroom of the restaurant.  As part of her work duties, A.P. sometimes cleaned the bathrooms and the lobby.  During one shift in November 2021, she went to the women's bathroom and locked the door behind her as was customary during cleaning.  Minor used a separate set of keys to access the bathroom while she was cleaning.  When minor came into the bathroom, A.P. was squatting in front of a toilet and cleaning; minor came up behind her and "smacked [her] butt."  He pulled his pants down, took his penis out, and wanted her to orally copulate him.  She turned around, still squatting, and he grabbed her head.  She told him no and told him to leave, but he said, "'No. Come on,'" and then asked, "'You don't want to?'" while putting his hand on her head.

A.P. described the incidents of oral copulation as a part of a pattern where she would clean the bathroom, minor would come into the bathroom, and he would force her to orally copulate him.  Another specific incident A.P. recalled occurred in March 2022 when she was cleaning the men's bathroom.  Like the other incidents, minor would have A.P. touch his penis, even though she told him no.  She told him she did not want to do it, that she "needed to continue finishing the bathrooms, and that he shouldn't be in the men's stalls."  But he grabbed her arm, put his hand on her head and pushed her down to

3.

his penis, and she orally copulated him. During this incident, minor ejaculated on her mask and her face, zipped up his pants afterward, told her to continue cleaning, and then left the bathroom. A.O., one of A.P.'s coworkers, came into the bathroom and told A.P. that minor was talking about her. A.P. asked A.O. to check on A.P. if she noticed minor coming back to the bathroom. Video footage taken on March 2, 2022, was played during the hearing; it showed the dining area of the restaurant with the bathroom doors at the back. The video showed A.P. going into the men's bathroom to clean and minor following her; minor left the bathroom and then returned. After minor exited the bathroom a second time, the video showed A.O. going into the bathroom. Although it felt much longer to A.P., the video showed minor was in the bathroom with A.P. for only a couple minutes.

During another shift, which A.P. believed was in December 2021, A.P. was cleaning the women's bathroom. Minor came into the bathroom while she was cleaning, moved in front of her, pulled down her work pants and underwear, and told her "not to be loud" because there was a breakroom on the other side of the wall. A.P. told minor she did not want to do "this," she told him to leave and to let her clean, but he said, "'No. Come on, man,'" and would not leave. He unzipped his pants and pulled out his penis, he moved closer to her and inserted his penis into A.P.'s vagina. She told him to move away, that it hurt, and she did not want to do it. She kept telling him to move off, and she was trying to get him off of her, but he kept trying to push himself into her vagina. She continued to tell him that it hurt, but he simply told her not to be so loud. He finally got up and told her to orally copulate him instead. He put his hands on her head and positioned her head toward his penis, and she did orally copulate him. He left the bathroom after it was over, and A.P. continued cleaning. After this incident, she experienced vaginal pain and bleeding for which she sought treatment from her pediatrician.

4.

On cross-examination, A.P. explained she once saw minor on the school bus after they had started working together, but she was unsure of the timing. He sat next to her because there was no other place to sit. They talked and were getting along at that point; she showed minor pictures on her phone, and sent him "sexy pictures" at some point after she got off the bus. She never wanted a romantic relationship with minor; during November and December, she was trying to transfer to a different restaurant for work so that she could get away from him. She did not tell anyone about what had happened until after the March incident; she was trying to resolve things on her own without involving law enforcement.

Starting in January 2022, she had a class with minor at school. They were paired as partners by the teacher. She did not tell the teacher she was uncomfortable. She denied meeting with minor outside of work, and she denied ever asking minor to buy her alcohol.

A.P.'s foster sister, E.R., started working at the restaurant around the same time as A.P.; she told E.R. about minor only generally. A.P. testified minor never punched or kicked her, and he never threatened her. She observed minor would flirt with other girls at work.

## B. Coworker's Testimony

A.O. was A.P.'s coworker; she started working at the restaurant in approximately October 2021; minor was already working there when A.O. started. She and A.P. knew each other from playing basketball together. A.O. observed that when she first started, minor and A.P. seemed to get along very well, but then the demeanor changed around November, and A.O. noticed there was a change in A.P.'s and minor's working relationship. A.O. never noticed minor flirting with any female employees, and he never tried to touch A.O. inappropriately or in any way that made her feel uncomfortable.

In March 2022, she was working the same shift with A.P. and minor. That day A.O. had to clean bathrooms as part of her duties, and A.P. asked if they could switch so

5.

that A.P. could clean the bathrooms instead. After A.P. cleaned the bathrooms, she told A.O. that there had been an incident—she was very vague about the details; A.P. told her minor had come into the bathroom asking if she needed help, and then proceeded to try to convince her to engage in oral sex; A.P. said she told him no a couple of times, and he walked out—A.P. never told A.O. that he forced her to engage in oral sex. A.P. had noticed at the beginning of the shift that A.O. had seemed uncomfortable and that she was avoiding minor; she seemed to be asking to trade various chores with A.O. to avoid being in the same area as he was. A.P.'s demeanor changed dramatically after the bathroom incident.

### C.    E.R.'s Testimony

E.R. was A.P.'s foster sister and worked with A.P. and minor at the restaurant. In one incident at work, minor grabbed E.R.'s butt, picked her up and set her on a counter. When she would clean the bathroom, he would come into the bathroom, start smoking and blow smoke in her face. There were no other incidents where he touched her. A.P. never told her about minor forcing A.P. to do anything sexual with him.

### D.    Minor's Testimony

Minor testified he knew A.P. from work, although their shifts did not overlap very often because A.P. was participating in sports. They went to school together, and one day they saw each other on the school bus. She showed him nude pictures, and tried to send them to him, but they would not send properly, so she sent them to him via Snapchat after she got off the bus.

According to minor, the two started flirting at work; they would touch and flirt where there were no cameras. A.P. never told him to leave her alone or to stop touching her. The first time they did more than flirt was in December 2021. They had mutually agreed to go to the bathroom at work and tried to have intercourse in the bathroom, but because the floor was dirty, they decided to limit their activities to oral sex. He thought it was mutual because they were kissing and touching, and she never said anything that

6.

indicated to him she was not "into it." On one occasion in February 2022, she wanted him to skip class, but he refused and they met after work instead. On another occasion, A.P. picked minor up near his house, and they were alone in her father's truck. Minor put his fingers in A.P.'s vagina, but discovered blood on his fingers, so he got out of the vehicle and started throwing up and wanted her to take him home. After that, he did not want anything to do with her; he felt badly about his reaction. She also subsequently asked him to purchase alcohol for her, but he refused, and that was when he stopped talking to her.

In March 2022, A.P. arrived at work with a hickey, which her coworkers were teasing her about. Minor assigned A.O. to clean the bathrooms, and instructed A.P. to clean the lamps in the lobby. But A.P. ended up cleaning the bathrooms, and she asked minor to help her. He went into the bathroom with her, and he thought she was mad at him because he did not speak up when she was being teased about the hickey. He asked her if she was okay, and whether she ended up getting the alcohol she had asked him to get for her on a previous occasion. He left the bathroom after their conversation. He went back into the bathroom a second time because he had to use it; once inside, A.P. locked the door so he thought A.P. was inviting him to have another one of their bathroom sessions. She stopped what she was doing and "willingly just [went] on the floor" and she orally copulated him. She never told him she did not want to participate, nor did she try to push him away.

## III.   Juvenile Court's Findings, Dispositional Hearing, and Order

Following argument from the parties, the court made findings and explained its reasoning as follows:

> "The thing that the Court finds disturbing as to Counts 1 and 2, is that both of these alleged incidents all occurred at work. That's—to me—in a locked room, seems highly unusual. If the two people, even if it's youths who are not capable of consent, technically—are going to engage in this

7.

kind of a conduct, I don't think doing it at work would be the way I would go about it.

"And I also would note that the Court had the opportunity to observe [A.P.]'s demeanor, and found her testimony to be rather compelling. As difficult as it was for her to get it out, the testimony she was able to cobble together, I found compelling.

"I find Counts 1 and 2 true beyond a reasonable doubt."

The court found counts 3 and 4 not true.

On August 22, 2023, a dispositional hearing was held. The probation officer explained that his recommendation regarding disposition was formulated by a group of employees within the probation department. The group looked at the circumstances presented, the long term program, the youth treatment program, and the secure track program. He indicated they chose secure track because it would offer minor sex offender counseling while in custody, which appeared appropriate based on the nature of the charges. Once the sex offender program was completed, minor could be stepped down at a review hearing to a lower level of care, which would be either the youth treatment program or the long term program. The prosecutor agreed with the recommendations of the probation officer.

The court explained it had found the victim "to be incredibly credible. Believable." The court disagreed with minor's counsel that the offenses were not violent. The court found the gravity of the offense to be "extremely high," and that the extent of harm to the victim was also high. While minor had no criminal history, the court found the confinement time recommended by probation was reasonable and necessary to complete the rehabilitation, especially as it related to the sex offender counseling. The court awarded 152 days of precommitment custody credits and calculated a maximum term of confinement of five years eight months and eight days; the baseline term of confinement imposed was four years.

8.

## DISCUSSION

### I. Date Variance Regarding Forcible Rape

The amended wardship petition filed in December 2022 asserted one count of forcible rape under Penal Code section 261, subdivision (a)(2), alleged to have occurred between November 1, 2021, and November 30, 2021. A.P.'s trial testimony indicated the only acts consistent with rape occurred in December 2021, although she testified that she was not entirely certain as to the date of those acts.

Minor argues that given this discrepancy between the petition allegation and the proof offered at the jurisdictional hearing, he had notice only that the alleged rape occurred in November 2021, and the prosecution failed to establish this fact. Given the discrepancy between the petition and the proof at the hearing, minor contends he was deprived of fair notice and had inadequate time to prepare a viable defense.

A juvenile in a delinquency matter is entitled to the same constitutional guarantees of due process as that accorded an adult criminal defendant, which includes constitutionally adequate notice of the charges. (*In re Jesse P.* (1992) 3 Cal.App.4th 1177, 1182, citing *In re Gault* (1967) 387 U.S. 1, 30–31, 33–34.) Due process requires notice of the charges sufficient to provide a meaningful opportunity to defend against them. (*People v. Hoyt* (2020) 8 Cal.5th 892, 923.) "Notice is supplied in the first instance by the accusatory pleading. [Citation.] But a variance between the pleading and proof at trial will be disregarded if it is not material. (*People v. LaMarr* (1942) 20 Cal.2d 705, 711.) 'The test of the materiality of a variance is whether the indictment or information so fully and correctly informs the defendant of the criminal act with which he is charged that, taking into consideration the proof which is introduced against him, he is not misled in making his defense, or placed in danger of being twice put in jeopardy for the same offense.'" (*Ibid.*)

In *People v. Amy* (1950) 100 Cal.App.2d 126, the defendant was charged with offenses committed on specific dates in June and December 1949. (*Id.* at p. 127.) But

testimony of the victim established the first offense occurred sometime while she was on summer vacation from school in 1949, and she did not know the specific date; further, she testified the second act charged occurred on a day when her mother went to the beauty shop about two weeks before Christmas. The defendant argued the prosecution had failed to prove a specific act on the specific date charged. (*Ibid.*) The court rejected this argument, explaining the variance was not material—the defendant was not misled in making his defense as he did not attempt to prove an alibi as to either of the specific dates charged, and his denial was of ever having committed any act on the child—regardless of the date. (*Id.* at p. 128.)

The same is true here: the variance between the pleading and the proof offered at the hearing was not material or prejudicial. Minor's defense did not involve an alibi for the time period alleged—his defense was that the sexual contact with A.P. was consensual. Whether the facts related to the rape occurred in November 2021 or December 2021 was immaterial to the elements of the charge and to minor's defense.

To the extent minor argues the date variance rendered the evidence insufficient to find the rape allegation true, the contention lacks merit. "The precise date on which an offense was committed need not be stated in an accusatory pleading unless the date is material to the offense ([Pen. Code,] § 955), and the evidence is not insufficient merely because it shows the offense was committed on another date." (*People v. Peyton* (2009) 176 Cal.App.4th 642, 660, citing *People v. Starkey* (1965) 234 Cal.App.2d 822, 827.)

## II. Substantial Evidence

Minor argues there was insufficient evidence that he accomplished rape or oral copulation by means of force, and that there was insufficient evidence to show a lack of consent—i.e., that A.P.'s will was overcome.

### A. Standard of Review

"'The same standard governs review of the sufficiency of evidence in adult criminal cases and juvenile cases: we review the whole record in the light most favorable

to the judgment to decide whether substantial evidence supports the conviction, so that a reasonable fact finder could find guilt beyond a reasonable doubt.'" (*In re A.G.* (2020) 58 Cal.App.5th 647, 653.) Substantial evidence is "'"evidence that is reasonable, credible, and of solid value ...."'" (*People v. Lee* (2011) 51 Cal.4th 620, 632.) "In conducting such a review, we '"presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation.]' [Citations.] 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.'" (*Ibid.*)

### B. Rape and Oral Copulation

Pursuant to Penal Code section 261, "Rape is an act of sexual intercourse accomplished ... [¶] ... [¶] ... against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." (*Id.*, subd. (a), (2).) Similarly, forcible oral copulation is the act of copulating the mouth of one person with the sexual organ or anus of another person "when the act is accomplished against the victim's will by means of force ...." (*Id.*, § 287, subd. (c)(2)(A).)

Consent, which is a defense to forcible rape and oral copulation, means "positive cooperation ... pursuant to an exercise of free will. The person must act freely and voluntarily ...." (Pen. Code, § 261.6, subd. (a).)

#### 1. Substantial Evidence of Force

Minor argues there is insufficient evidence of force necessary for both the forcible rape and oral copulation counts the juvenile court found true. Minor contends there is no evidence A.P. communicated to minor her unwillingness to engage in intercourse or oral copulation; rather, the evidence shows she would say no to minor, and then he would coax her into doing what he wanted—no force was used. According to minor, A.P.'s

11.

testimony lacks an indication she attempted to get away from minor, or that minor used any force to overcome A.P.'s will.

In *People v. Griffin* (2004) 33 Cal.4th 1015 (*Griffin*), the court explained the "gravamen of the crime of forcible rape is a sexual penetration *accomplished against the victim's will* by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury.… [I]n a forcible rape prosecution[,] the jury determines whether the use of force served to overcome the will of the victim to thwart or resist the attack, *not* whether the use of such force physically facilitated sexual penetration or prevented the victim from physically resisting her attacker." (*Id.* at p. 1027.) Indeed, the court pointed out, "the rape case law suggests that even conduct which might normally attend sexual intercourse, when engaged in with force sufficient to overcome the victim's will, can support a forcible rape conviction." (*Ibid.*) Stated differently, force for purposes of forcible rape is the degree of physical force sufficient to support the finding the sexual activity was against the victim's will. (*Id.* at pp. 1023–1024.) It need not be different or substantially greater than the force inherent in consensual sexual activity. (*Id.* at p. 1023.) Moreover, "'''[t]he kind of physical force is immaterial*; … it may consist in the taking of indecent liberties with a woman, or laying hold of and kissing her against her will.'''" (*Id.* at p. 1024.)

Subsequently, in *People v. Guido* (2005) 125 Cal.App.4th 566, the court considered "force" in the context of aggravated sexual assault of a child by forcible oral copulation. The court extended the reasoning of *Griffin* as to the definition of force, concluding it "appl[ies] equally to the crime of forcible oral copulation." (*Guido, supra*, at p. 576.) "As with forcible rape, it is only when one participant in the act uses force to commit the act against the other person's will that an otherwise lawful act becomes unlawful." (*Ibid*.) The court concluded that "there is no reasoned basis to apply a different concept of the term 'force' to forcible rape and forcible oral copulation and [the court held] oral copulation by force within the meaning of [former Penal Code]

section 288a, subdivision (c)(2) is proven when a jury finds beyond a reasonable doubt that [the] defendant accomplished an act of oral copulation by the use of force sufficient to overcome the victim's will." (*Ibid.*)

Minor argues A.P.'s testimony indicates only that she initially told minor no, but he subsequently coaxed her into participating willingly; no force was used. Minor contrasts the facts here with those of *In re Jose P.* (2005) 131 Cal.App.4th 110 (*Jose P.*) There, the victim and the minor, 15 years old and 16 years old respectively, had been kissing and moved to another room where the minor lifted the victim, set her down on a bed, removed her clothes and laid on top of her without any objection from the victim. (*Id.* at p. 113.) When the minor started to put his penis into the victim's vagina, she told him she did not want to do this, and the minor stopped. (*Ibid.*) They continued kissing, and subsequently the minor again attempted penetration. (*Ibid.*) The victim again told the minor she did not want to do "'this,'" and she told him it hurt. (*Ibid.*) He told her it would "'feel better,'" and "penetrated her 'a little bit,'" which was painful to the victim. (*Ibid.*) The minor did stop when she told him to. (*Ibid.*) They continued their encounter, with the minor remaining on top of the victim. (*Ibid.*) They spoke for five minutes, and the minor again attempted penetration; the victim told him to stop, but he "continued until he 'put it all the way in, just once' and, only then, did he stop." (*Ibid.*) The victim did not pull away because she could not—the minor was on top of her. (*Ibid.*)

The appellate court rejected the minor's challenge on appeal that the evidence was insufficient to establish the force necessary for forcible rape. (*Jose P., supra*, 131 Cal.App.4th at pp. 117–118.) The court reasoned there was no doubt that the victim voluntarily and actively engaged in sexual foreplay with the minor, and she continued to do so after he twice attempted penetration and was rebuffed. (*Id.* at p. 117.) Nevertheless, she also made it clear to the minor, "repeatedly and prior to penetration, both that she did not want to be penetrated and that [the minor]'s efforts were both against her will and physically painful to her." (*Ibid.*) This was substantial evidence to

13.

show that the minor forced his penis inside the victim against her will and thus violated Penal Code section 261, subdivision (a)(2). (*Jose P., supra*, at p. 118.)

Here, viewing the evidence in the light most favorable to the judgment, we concluded, like *Jose P.*, there was substantial evidence from which a reasonable factfinder could conclude minor used sufficient force. With respect to the rape in December 2021, A.P. repeatedly told minor no: he removed her clothes despite that she told him no, and he positioned himself on her; he also refused to get off of her when she told him it hurt, and she tried to push him away. This testimony is evidence from which a reasonable factfinder could conclude force was used by minor in positioning A.P., and refusing to move off of her when she tried to push him away during intercourse. The juvenile court found A.P.'s testimony compelling and believable, and credited her version of events, which it was entitled to do. (*People v. Jones* (2013) 57 Cal.4th 899, 963 [unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction]; see Evid. Code, § 411.)

As for the forcible oral copulation charge, although A.P. indicated she was forced to orally copulate minor on several occasions, she remembered one incident specifically occurring in March. She testified the March incident was the same as the others, and indicated he forced her to orally copulate him by grabbing her arm, putting his other hand on her head and pushing her head down toward his penis; she told him she did not want to participate. The act of positioning her and forcing her head down to his penis despite her objection, was evidence from which a reasonable trier of fact could conclude was force sufficient to overcome the victim's will. (See *People v. Thomas* (2017) 15 Cal.App.5th 1063, 1072 [the defendant used sufficient force to overcome child's will by leading her by the hand into the bathroom, positioning her body on the sink before digitally penetrating her].) The fact that she did not resist when minor pushed her head to his penis is not dispositive. (See *Griffin, supra*, 33 Cal.4th at p. 1025 [the degree of force utilized is immaterial].) She repeatedly told him she did not want to participate, and by

14.

grabbing her arm and pushing her head down to his penis, a trier of fact could reasonably conclude minor physically signaled to her that "no" was not an acceptable answer and forced her to participate against her will.  This was evidence from which a reasonable factfinder could conclude established sufficient force.

### 2. Sufficient Evidence Minor Overcame the Will of the Victim

Forcible rape (Pen. Code, § 261, subd. (a)(2)) and forcible oral copulation (Pen. Code, § 287, subd. (c)(2)(A)) require proof the victim did not consent to the act. (CALCRIM Nos. 1000, 1015.)

Minor contends A.P.'s testimony shows she acquiesced to minor's overtures through minor's "coaxing and cajoling."  Minor argues there is no substantial evidence that minor acted against A.P.'s will because he reasonably believed A.P. had consented. But A.P. clearly testified that she very expressly and directly told defendant she was unwilling to participate in the sexual act of intercourse in December 2021 both before he pulled down her pants and underwear, and when he penetrated her with his penis—she told him to stop, and she tried to push him off of her.  Crediting this testimony, as the juvenile court did, it could reasonably find she did not consent to the act and that A.P.'s will was overcome.

As for the forced oral copulation, A.P. testified that after she had already told him not to touch her, minor grabbed her arm and put his other hand on her head and lowered her down to orally copulate him.  In the process of minor's actions, A.P. again told him she did not want to participate.  A.P.'s testimony was not equivocal, and the juvenile court credited it in full.  As a reviewing court, we do not reweigh the testimony.  "'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the [factfinder] to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.'" (*People v. Mumin* (2023) 15 Cal.5th 176, 202.)  It was simply not A.P.'s testimony that she ever consented to sexual intercourse in December or oral copulation in March; by

repeatedly telling minor she did not want to participate in the sexual acts in December and March, which the juvenile court credited, the court could reasonably find A.P. had not consented to the act, and her will was overcome by the force minor applied.

Beyond finding A.P. highly credible, the juvenile court reasoned it was less likely that a consensual encounter would happen in a public bathroom—circumstances the court implicitly reasoned favored A.P.'s version that the interaction was against her will. Minor contends this reasoning ignores the fact the two may not have had anywhere else to find some privacy, and it does not "speak to whether anything criminal happened." However, the testimony established minor and A.P. attended the same high school and had a class together; there was evidence the couple had other locations to meet beside their workplace bathroom. Given this, the court's conclusion about the bathroom location as an implausible spot for a consensual encounter was not an unreasonable inference to draw in assessing which of the two conflicting versions of events was true and credible, even if a different inference could have been drawn. (*In re Eric J.* (1979) 25 Cal.3d 522, 527 [when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court].) Moreover, the plausibility of a witness's version of events is an issue of credibility and the weight to be assigned to the evidence—issues solely within the province of the factfinder.

Minor argues additionally that the juvenile court was presented with "ample evidence" of minor's understanding that A.P. wanted to sexually engage with him. A.P. had sent minor "sexy" pictures on an occasion when they rode the bus together, and on the date of the March incident, A.P. had specifically traded work tasks so she could take bathroom-cleaning duty, which explained minor's motivation to join her in the bathroom. To draw such inferences and conclusions, the juvenile court would have had to discredit some or all of A.P.'s testimony, which it did not do. The fact that A.P.'s and minor's testimony could have been credited and weighed differently by the juvenile court and could have supported a different view, as minor contends, does not undercut the

16.

substantial evidence that supports the court's findings as to both counts. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947 [reviewing court will affirm an order if supported by substantial evidence even if other evidence supports a contrary conclusion]; *People v. Manibusan* (2013) 58 Cal.4th 40, 87 ["'Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal.'"].)

## III. Minor's Placement At a SYTF Was Not an Abuse of Discretion

Minor argues placement at a SYTF was unjustly restrictive, and minor should have instead been given the opportunity to succeed in a less restrictive program. Minor contends the juvenile court's consideration of the severity of the offenses did not "take into account the history of two young people flirting with each other, and the possibility of misunderstanding," nor did it "take into account all of the 'mutual' events that led up to the dates in question, or the fact that [the victim] had requested to be shifted to bathroom cleaning duty on [the day of the March incident]." Moreover, minor asserts, there was no evidence he was a threat to society or that the SYTF was a suitable placement. According to minor, there was "no evidence presented by the prosecution or probation that [minor] could not have been rehabilitated in a less-restrictive setting."

Section 875 permits that a court may order a ward who is 14 years of age or older to be committed to a SYTF for a period of confinement if (1) the juvenile is adjudicated and found to be a ward of the court based on an offense listed in section 707, subdivision (b), that was committed when the juvenile was 14 years of age or older; (2) the adjudication is the most recent offense for which the juvenile has been adjudicated; and (3) the court has made a finding on the record that a less restrictive, alternative disposition for the ward is unsuitable. (§ 875, subd. (a)(1)–(3).)

To make a determination on the third prong, the court is required to consider all relevant and material evidence, including the recommendations of counsel, the probation

department, and any other agency or individual designated by the court to advise on the appropriate disposition. The court is also to make its determination based on the following criteria: (A) the severity of the offenses for which the ward has most recently been adjudicated, including the ward's role in the offense, the ward's behavior, and harm done to victims; (B) the ward's previous delinquent history, including the adequacy and success of previous attempts by the juvenile court to rehabilitate the ward; (C) whether the programming, treatment, and education offered and provided in a SYTF is appropriate to meet the treatment and security needs of the ward; (D) whether the goals of rehabilitation and community safety can be met by assigning the ward to an alternative, less restrictive disposition that is available to the court; and (E) the ward's age, developmental maturity, mental and emotional health, sexual orientation, gender identity and expression, and any disabilities or special needs affecting the safety and suitability of committing the ward to a term of confinement in a SYTF. (§ 875, subd. (a)(3)(A)–(E).) When making a finding that a less restrictive alternative disposition is unsuitable, courts are not required to attempt a less restrictive placement before ordering commitment to one that is more restrictive. (See *In re Nicole H.* (2016) 244 Cal.App.4th 1150, 1159 (*Nicole H.*) [considering case law addressing placement of juveniles at the DJJ[2] and noting "there is no rule that [a DJJ] placement cannot be ordered unless less restrictive placements have been attempted"].)

"We review the court's placement decision for an abuse of discretion." (*Nicole H., supra*, 244 Cal.App.4th at p. 1154, citing *In re Antoine D.* (2006) 137 Cal.App.4th 1314, 1320.) The juvenile court abuses its discretion "'"'"when the factual findings critical to its decision find no support in the evidence.'"'"'" (*In re Carlos J.* (2018) 22 Cal.App.5th 1, 5.) A reviewing court does not disturb a juvenile court's findings when there is substantial evidence to support them. (*In re Khalid B.* (2015) 233 Cal.App.4th 1285,

---

[2]     Division of Juvenile Justice (DJJ).

1288.) "'""In determining whether there was substantial evidence to support the commitment, we must examine the record presented at the disposition hearing in light of the purposes of the Juvenile Court Law,'"'"" which includes public safety as well as the rehabilitation of the juvenile offender. (*Carlos J., supra*, at p. 5, quoting *In re Calvin S.* (2016) 5 Cal.App.5th 522, 528.)

The record reflects the court considered all the relevant criteria in concluding that a less restrictive placement was not suitable, including minor's lack of prior delinquent history, the severity of the offense, which the court construed as "extremely high," the lack of any coparticipants with no mitigating circumstances, and the programming available at the recommended SYTF, which included counseling for sex offenders that could not be obtained at a less restrictive program. Although minor argues the juvenile court failed to take into account the factual context of the offenses, this is an argument the court could have weighed the testimony differently, and could have drawn different inferences—but the court did not do so.

Moreover, the probation report, with which the juvenile court expressly concurred, explained that a less restrictive placement—the youth treatment program—did not offer sex offender treatment services, which the probation officer indicated was necessary in light of the charged offenses found true by the juvenile court. The probation report also noted that minor could be assigned to an alternative, less restrictive placement at the six-month review hearing if the sex offender treatment program was completed.

Given the severity of the offenses and the availability of sex offender counseling treatment only at the SYTF, the juvenile court did not abuse its discretion by committing minor to the SYTF and finding less restrictive alternative dispositions unsuitable because the less restrictive alternative dispositions did not meet the goals of both rehabilitation and public safety.

## IV.  Precommitment Custody Credits

Minor contends the juvenile court erred in awarding 152 days of precommitment custody credits to minor's maximum term of confinement (§ 875(c)(1)) rather than to the baseline term of confinement (§ 875(b)(1)), despite that as of May 2021, newly added section 875(c)(1)(C) requires that a juvenile's precommitment custody credits for time served "must be" applied against the "maximum term of confinement .…"

### A.  Realignment

"'Until recently, the Department of Corrections and Rehabilitation, Division of Juvenile Justice (DJJ) was "the state's most restrictive placement for its most severe juvenile offenders .…"'"  (*In re M.B.* (2024) 99 Cal.App.5th 435, 448 (*M.B.*).)  In 2020 and 2021 the Legislature passed a series of bills aimed at '[j]uvenile justice realignment,' with the purpose 'to ensure that justice-involved youth are closer to their families and communities and receive age-appropriate treatment' and 'to establish a separate dispositional track for higher-need youth.'  (Sen. Bill No. 823 (2019–2020 Reg. Sess.) (Stats. 2020, ch. 337, §§ 1, 30); see Sen. Bill No. 92 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 18) (Sen. Bill 92) [requiring, among other things, for counties to establish SYTF's])."  (*In re Jose R.* (2024) 102 Cal.App.5th 839, 845 (*Jose R.*).)

Under this realignment, the Legislature transferred to county governments the responsibility for minors who have been adjudged wards of the court, and who would have been committed to DJJ.  (§ 736.5, subd. (a); *Jose R., supra*, 102 Cal.App.5th at p. 845.)  Effective July 1, 2021, with narrow exceptions, minors are no longer committed to DJJ (§ 736.5, subd. (b)), and DJJ was required to close on June 30, 2023 (*id.*, subd. (e)).  Senate Bill No. 92 (2021–2022 Reg. Sess.) added section 875, which took effect on May 14, 2021.  (See Sen. Bill No. 92 (Stats. 2021, ch. 18, § 12).)  Pursuant to section 875, a ward who meets certain criteria may be committed to the SYTF.  (§ 875, subd. (a); *Jose R., supra*, at p. 845.)

The Legislature also changed the form of sentencing for juvenile offenders:

"Prior to July 2021, when a ward was committed to DJJ, the juvenile court was required to 'set a maximum term based upon the facts and circumstances of the matter … and as deemed appropriate to achieve rehabilitation.' (§ 731, subd. (b), former subd. (c).) Section 726, subdivision (d)(1), in turn, mandated (as it does today) that a juvenile sentencing 'order shall specify that the minor may not be held in physical confinement for a period in excess of the middle term of imprisonment which could be imposed upon an adult convicted of the offense or offenses which brought or continued the minor under the jurisdiction of the juvenile court.' Section 726, subdivision (d)(1), therefore set a nondiscretionary statutory limit on the commitment term imposed by the court (which the *M.B.* court referred to as the maximum exposure term). (See [*In re*] *M.B.* [(2024) 99 Cal.App.5th [435,] 466.) Accordingly, the 'maximum term' of imprisonment imposed by the court pursuant to section 731 (the maximum custodial term) in many cases is shorter than the maximum exposure term defined by section 726. (See *In re Ernesto L.* (2022) 81 Cal.App.5th 31, 39, (*Ernesto L.*) [§ 731 'conferred on juvenile courts the "'discretion to impose less than the adult maximum term of imprisonment when committing a minor to [DJJ]'"'].)

"The statutes governing DJJ commitments did not specify whether the minor's precommitment custody credits should be applied against the maximum custodial term imposed under section 731 or the maximum exposure term under section 726. The Courts of Appeal were divided on this question. The Fourth Appellate District in *In re A.R.* (2018) 24 Cal.App.5th 1076 concluded precommitment custody credits should apply to the maximum exposure term under section 726, not the maximum custodial term imposed under section 731. By contrast, the First Appellate District in *Ernesto L., supra*, 81 Cal.App.5th at page 34 held 'that when a minor is committed to DJJ, a juvenile court must apply the minor's precommitment credits against the maximum custodial term' imposed under section 731.

"After realignment, when a juvenile court commits a minor to SYTF, the court must likewise set a baseline period of confinement and a statutory maximum. Section 875, subdivision (b)(1), provides that the court must 'set a baseline term of confinement' that 'shall represent the time in custody necessary to meet the developmental and treatment needs of the ward and to prepare the ward for discharge ….' The baseline term is subject to potential downward modification (or a ward may be released from SYTF

and assigned to a less restrictive program) during progress review hearings that must be held at least once every six months. (§ 875, subds. (b)(1) & (e).) The court must 'additionally set a maximum term of confinement for the ward based upon the facts and circumstances of the matter … and as deemed appropriate to achieve rehabilitation.' (§ 875, subd. (c)(1).) The maximum term of confinement 'shall represent the longest term of confinement in a facility that the ward may serve,' subject to certain limitations, including that '[t]he maximum term of confinement shall not exceed the middle term of imprisonment that can be imposed upon an adult convicted of the same offense or offenses.' (§ 875, subd. (c)(1)(B).) This maximum term of confinement serves as a limit on how long a ward's time in custody may be extended at the conclusion of the baseline term if the court finds 'the ward constitutes a substantial risk of imminent harm to others in the community if released from custody' (§ 875, subd. (e)(3)) and on how long a ward may be recommitted to a SYTF after being placed in a less restrictive program (*id.*, subd. (f)(2)). Finally, … section 875, subdivision (c)(1)(C), provides, 'Precommitment credits for time served must be applied against the maximum term of confinement as set pursuant to this subdivision.'" (*Jose R., supra*, 102 Cal.App.5th at pp. 845–847, fns. omitted.)

## B. Precommitment Custody Credits Apply to Maximum Term of Confinement

Minor argues the juvenile court erred by applying his precommitment custody credits to the *maximum term of confinement* the court imposed under section 875(c)(1), rather than the baseline term imposed under section 875(b)(1).[3] Minor contends that,

---

[3] Section 875(c)(1) provides, in relevant part, that the "maximum term of confinement shall represent the longest term of confinement in a facility that the ward may serve subject to the following: [¶] (A) [I]f the ward has been committed to a [SYTF] based on adjudication for an offense or offenses for which the ward, if convicted in adult criminal court, would face an aggregate sentence of seven or more years, the ward shall not be held in secure confinement beyond 25 years of age, or two years from the date of commitment, whichever occurs later." Here, the aggregate sentence minor would have faced if convicted in adult criminal court was eight years; as he was nearly 19 years old at the time of the dispositional order, minor could not be confined past the age of 25 years. Given minor's birthdate and the age restriction under section 875(c)(1)(A), the maximum term of confinement calculation stated in the commitment order of five years eight months and eight days includes the 152 days of precommitment custody credit.

prior to realignment under *In re Ernesto L.* (2022) 81 Cal.App.5th 31, 39, (*Ernesto L.*), courts were required to apply precommitment custody credits to the maximum custodial term under section 731, subdivision (b), which minor argues is functionally "similar to, if not the equivalent of" the baseline term that juvenile courts must impose after realignment under section 875(b)(1). Accordingly, minor asserts, *Ernesto L.*'s reasoning should be applied here, and the juvenile court should be ordered to apply the precommitment custody credits to the baseline term because it is most analogous to the term imposed under section 731, subdivision (b), prior to realignment.

We disagree. First, as explained in *Jose R.*, there is no need to analogize to *Ernesto L.* and the former DJJ context to determine how precommitment custody credits apply after the Legislature's realignment: section 875(c)(1)(C) expressly states that "Precommitment credits for time served must be applied against the maximum term of confinement as set pursuant to this subdivision"—i.e., subdivision (c)(1). (*Jose R., supra*, 102 Cal.App.5th at p. 848.) Where statutory language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. (*Raines v. U.S. Healthworks Medical Group* (2023) 15 Cal.5th 268, 278–279.)

Moreover, as explained in *In re M.B* (2024) 99 Cal.App.5th 435, 469–472, section 875(c)(1)(C)'s unambiguous requirement that precommitment custody credits be applied to the maximum term of confinement (as opposed to the baseline term) *is* consistent with *Ernesto L.* In *Ernesto L.*, the appellate court held that when a ward is committed to the DJJ, the ward's precommitment custody credits must be applied against the term *Ernesto L.* coined the "maximum custodial term" described under section 731, subdivision (b). (*Ernesto L., supra*, 81 Cal.App.5th at p. 43.)[4] That statutory provision required that a ward committed to DJJ "shall not be confined in excess of the term of

---

[4]     Section 731 is no longer in effect due to the final closure of the DJJ. (*Id.*, subd. (c).)

23.

confinement set by the committing court." (§ 731, subd. (b).) In addition, section 731, subdivision (b), provided the maximum term set by the court was to be "'based upon the facts and circumstances'" (*Ernesto L., supra*, at p. 43) that brought or continued the minor under the jurisdiction of the court and as deemed appropriate to achieve rehabilitation.

Ernesto L. contrasted this maximum custodial term under section 731 with what it described as the "'maximum exposure term'" set by section 726, subdivision (d)(1). (*Ernesto L., supra*, 81 Cal.App.5th at p. 34.) Specifically, section 726, subdivision (d)(1), set a theoretical maximum for a minor's term of physical confinement that was not to exceed the middle term of imprisonment that could be imposed upon an adult convicted of the offense or offenses which brought or continued the minor under the jurisdiction of the juvenile court. When comparing these provisions side by side, section 731, subdivision (b), gave the juvenile court discretion, based on the facts and circumstances presented, to set the actual maximum custodial term *lower* than the theoretical maximum term of physical confinement described in section 726, subdivision (d)(1). Section 731 further provided that a ward committed to DJJ "shall not be confined in excess of the term of confinement set by the committing court." (*Id.*, subd. (b).) Relying on the reasoning in *In re Eric J., supra*, 25 Cal.3d at page 536, which interpreted similar "not be confined" language in section 726, the court in *Ernesto L.* held that section 731, subdivision (b)'s "not be confined" language referred to both precommitment and postcommitment physical confinement. Thus, for a minor to "not be confined" beyond the term ordered under section 731, which could be *less* than the theoretical maximum term of confinement under section 726, the precommitment custodial credits had to be applied to the maximum custodial term ordered under section 731, not the theoretical maximum under section 726. (*Ernesto L., supra*, 81 Cal.App.5th at p. 41.)

As *M.B.* explained, after realignment, the maximum term of confinement under section 875(c), operates analogously to the maximum custodial term under section 731,

subdivision (b); thus, applying precommitment custody credits to the maximum term of confinement under section 875(c) (rather than the baseline term) is fully consistent with *Ernesto L.* Even after realignment, section 726, subdivision (d)(1), still provides the dispositional order must "specify that the minor may not be held in physical confinement for a period in excess of the middle term of imprisonment which could be imposed upon an adult convicted of the [same] offense or offenses .…" (*Ibid.*; accord, *M.B., supra*, 99 Cal.App.5th at p. 466.) "Section 726 defines '"[p]hysical confinement"' to include both DJJ and SYTF placements, among other things. (§ 726, subd. (d)(5).) The maximum period of confinement permitted by statute—the middle term of imprisonment that would apply to an adult—is thus the same under section 726 for both types of commitments. And section 875 states this same limitation for SYTF commitments in particular. (§ 875, subd. (i); see *id.*, subd. (c)(1)(B).)" (*M.B., supra*, 99 Cal.App.5th at pp. 466–467, fns. omitted.)

Additionally, both section 731, governing DJJ commitments, and section 875, governing SYTF commitments, give the juvenile court discretion to set a maximum term that is lower than the maximum permitted by section 726. (*M.B., supra*, 99 Cal.App.5th at p. 468.) Finally, in both settings, precommitment credits are to be applied against the potentially lower maximum term set by the court—credits were to be applied to the "maximum custodial term" under section 731, subdivision (b), in the DJJ setting, and credits for SYTF commitments must be applied to the maximum term set under section 875(c)—both of which are maximum terms set by the court based on the facts and circumstances presented and may be lower than the theoretically maximum sentence permitted under section 726. (*M.B., supra*, at p. 468.)

Thus, even under *Ernesto L.*'s reasoning with respect to custody credits in the DJJ context, precommitment custody credits must be applied to the maximum term of confinement calculated under section 875(c), *not* the baseline term under section 875(b)(1)—which is not the maximum term. Different from the maximum terms

calculated under either section 731, subdivision (b) (for DJJ commitments) or section 875(c) (for SYTF commitments), section 875(b)(1)'s baseline term "represent[s] the time in custody necessary to meet the developmental and treatment needs of the ward and to prepare the ward for discharge to a period of probation supervision in the community." (*Ibid.*) As explained in *M.B.*, "[i]n the SYTF context, it is the section 875, subdivision (c) maximum term of confinement that sets the limit on the length of a ward's confinement; the section 875, subdivision (b) baseline term is not described as, and does not function as, a maximum term." (*M.B., supra*, 99 Cal.App.5th at p. 469.)

Minor argues section 875(c)(2), creates an ambiguity when read in conjunction with section 875(c)(1), (c)(1)(A) and (c)(1)(B). Section 875(c)(2), provides that, "For purposes of this section, 'maximum term of confinement' has the same meaning as 'maximum term of imprisonment,' as defined in paragraph (2) of subdivision (d) of Section 726." In turn, the "'maximum term of imprisonment'" under section 726, subdivision (d)(2), is defined as the middle term of imprisonment that can be imposed on an adult for the same offense or offenses. As we understand the argument, minor contends the maximum term of confinement under section 875(c), has inconsistent meanings—on the one hand, it is a term "based upon the facts and circumstances of the matter" as set forth in section 875(c)(1), and, on the other hand, it is also the middle term of imprisonment that could be imposed on an adult convicted of the same offense(s) under section 875(c)(2). Beyond that, minor argues, section 875(c)(2), also contradicts section 875(c)(1)(A), which provides age and timing restrictions on calculating the maximum term of commitment.

Section 875(c)(1) directs that in making its order of commitment, the juvenile court is to "set a maximum term of confinement for the ward based upon the facts and circumstances of the matter or matters that brought or continued the ward under the jurisdiction of the court and as deemed appropriate to achieve rehabilitation. *The*

*maximum term of confinement shall represent the longest term of confinement in a facility that the ward may serve subject to*" section 875(c)(1)(A) and (B).  (Italics added.)

In turn, section 875(c)(1)(A) and (B) provide as follows:  "(A) A ward committed to a [SYTF] under this section shall not be held in secure confinement beyond 23 years of age, or two years from the date of commitment, whichever occurs later.  However, if the ward has been committed to a [SYTF] based on adjudication for an offense or offenses for which the ward, if convicted in adult criminal court, would face an aggregate sentence of seven or more years, the ward shall not be held in secure confinement beyond 25 years of age, or two years from the date of commitment, whichever occurs later.  [¶]  (B) The maximum term of confinement shall not exceed the middle term of imprisonment that can be imposed upon an adult convicted of the same offense or offenses…."

When considering statutory language, we must construe the words of the statute in context, and "'statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible.'"  (*People v. Valencia* (2017) 3 Cal.5th 347, 357.)  Section 875(c), and its subparagraphs can be harmonized and read together—they are not inconsistent or ambiguous.  Pursuant to section 875(c)(1), the maximum term of commitment shall reflect the facts and circumstances of the matter (*ibid.*), and shall *also* be subject to the limitations imposed under section 875(c)(1)(A) and (B).  (*Jose R., supra*, 102 Cal.App.5th at pp. 848–849.)  These provisions are not mutually exclusive, and they can operate together without inconsistency.  Because there is no ambiguity, let alone an egregious ambiguity, minor's invocation of the rule of lenity is not applicable.  (*People v. Manzo* (2012) 53 Cal.4th 880, 889 [the rule of lenity applies ""''only if the court can do no more than guess what the legislative body intended; there must be an *egregious* ambiguity and uncertainty to justify invoking the rule"''"].)

Finally, minor points to *People v. Riolo* (1983) 33 Cal.3d 223 for the proposition that precommitment custody credits should not be imposed against a hypothetical

maximum term, but to the actual term of imprisonment. (*Id.* at p. 228.) *Riolo*, however, is inapposite because it related to custody credits in adult criminal cases under the Penal Code, and minor does not explain how its reasoning should govern section 875, which expressly requires that precommitment custody credits are to be applied against the maximum term of confinement calculated under section 875(c).

We conclude section 875(c)(1)(C) unambiguously requires that precommitment custody credits be applied against the maximum term of confinement, which is consistent with how custody credits were applied under *Ernesto L.* before realignment. As such, the juvenile court did not err in awarding precommitment custody credits against the maximum term of confinement imposed under section 875(c).

## C.  Equal Protection

Minor argues that a classification treating DJJ commitments differently from SYTF commitments with respect to precommitment custody credits is a violation of equal protection. Specifically, minor maintains that the maximum term of confinement under section 875(c), is the equivalent of the statutory maximum term articulated in section 726—thus, youths committed to SYTF after realignment suffer disparate treatment compared to those youths committed to DJJ before realignment with respect to their precommitment custody credits.

The federal and California Constitutions both guarantee individuals the equal protection of the laws. (U.S. Const., 14th Amend., § 1; Cal. Const., art. 1, § 7, subd. (a); *People v. Hardin* (2024) 15 Cal.5th 834, 847 & fn. 2; *People v. Williams* (2024) 17 Cal.5th 99, 122.) "'[T]he requirement of equal protection ensures that the government does not treat a group of people unequally without some justification.' [Citation.] 'Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made.'" (*People v. Williams, supra*, at p. 122.) "[W]hen plaintiffs challenge laws drawing distinctions between identifiable groups or classes of persons, on the basis that

28.

the distinctions drawn are inconsistent with equal protection, courts no longer need to ask at the threshold whether the two groups are similarly situated for purposes of the law in question. The only pertinent inquiry is whether the challenged difference in treatment is adequately justified under the applicable standard of review." (*Hardin, supra*, at pp. 850–851.)

Depending on the type of classification involved, different levels of scrutiny may apply. (*People v. Williams, supra*, 17 Cal.5th at p. 122.) "'"At a minimum, a statutory classification must be rationally related to a legitimate governmental purpose."'" (*Ibid.*) If the unequal treatment involves a suspect class or fundamental right, then strict scrutiny is applied, and the state bears the burden of establishing both a compelling interest that justifies the law and that the distinctions drawn by the law are necessary to further its purpose. (*Ibid.*)

Minor's argument was persuasively rejected in *Jose R.* and *M.B.* First, section 875(c)(1)(C) functions analogously to the application of custody credits under *Ernesto L.*—precommitment custody credits are applied to the maximum confinement term set under section 875(c)(1) not against section 726's maximum exposure term, the middle term for adults convicted of the same offense or offenses as explained, *ante*, and by the court in *M.B.* As DJJ wards and SYTF wards are treated the same under section 875(c) and section 731, "there is no disparate treatment that could give rise to an equal protection problem." (*M.B., supra*, 99 Cal.App.5th at p. 467, fn. omitted.)

Moreover, even if section 875(c)(1)(C) resulted in different, less favorable treatment of SYTF youths with respect to custody credits, the statute does not violate equal protection principles. (*Jose R., supra*, 102 Cal.App.5th at p. 850.) "The right to equal protection of the law generally does not prevent the state from setting a starting point for a change in the law. '[T]he Fourteenth Amendment does not forbid statutes and statutory changes to have a beginning and thus to discriminate between the rights of an earlier and later time.'" (*People v. Lynch* (2012) 209 Cal.App.4th 353, 359, quoting

*Sperry & Hutchinson Co. v. Rhodes* (1911) 220 U.S. 502, 505.)  Stated differently, "as the Supreme Court has explained, the Legislature is entitled to make changes to sentencing statutes that create disparities between how individuals are sentenced before and after the amendments without violating principles of equal protection." (*Jose R., supra*, at p. 850, citing *People v. Floyd* (2003) 31 Cal.4th 179, 191 [rejecting 14th Amend. challenge to Prop. 36, the Substance Abuse and Crime Prevention Act of 2000, reasoning, the 14th Amend. "'does not forbid statutes and statutory changes to have a beginning, and thus to discriminate between the rights of an earlier and later time'"]; *Baker v. Superior Court* (1984) 35 Cal.3d 663, 668–670 [extension of involuntary commitment of a mentally disordered sex offender (MDSO) who was committed before the repeal of the MDSO law and remained subject to the former law was not a denial of equal protection even though persons convicted of a sex offense after the repeal were sentenced to a determinate prison term and were not subject to extended commitment]; *Mundy v. Superior Court* (1995) 31 Cal.App.4th 1396, 1408 [failure to apply newly enacted more lenient property forfeiture law did not "violate Mundy's equal protection rights, given the Legislature's prerogative to make statutory amendments prospective only"].)  The changes in the law after realignment do not treat youths differently with respect to custody credits, and even if it did, it would not violate equal protection.  (*Jose R., supra*, at p. 850.)

## DISPOSITION

The juvenile court's jurisdictional hearing findings and dispositional order are affirmed.